824 So.2d 1063 (2002)
STATE of Louisiana
v.
Roger LaCAZE.
No. 99-KA-0584.
Supreme Court of Louisiana.
January 25, 2002.
*1065 G. Benjamin Cohen, Clive A. Smith, New Orleans, Lane R. Trippe, New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Harry F. Connick, District Attorney, John J. Glas, New Orleans, Valentin M. Solino, Counsel for Defendant.
TRAYLOR, Judge.[*]
On April 27, 1995, an Orleans Parish Grand Jury indicted the defendant, Roger LaCaze, for three counts of first degree murder in violation of La.Rev.Stat. 14:30. After a trial by jury, the Defendant was found guilty as charged on all three counts. At the conclusion of the penalty phase the jury, having found multiple aggravating factors, unanimously sentenced defendant to death. The trial judge sentenced defendant to death in accordance with the jury determination. This matter is now before this court on direct appeal. La. Const. art. V, § 5(D).[1] On appeal, Defendant alleges twenty-seven assignments of error for the reversal of his conviction and sentence.[2] Finding no merit to Defendant's assignments of error, we affirm his sentence and conviction.

Factual Background and Procedural History
On April 27, 1995, an Orleans Parish grand jury indicted the defendant Roger[3] LaCaze and co-defendant Antoinette Frank for three counts of first degree *1066 murder. La.Rev.Stat. 14:30. The cases were severed. Following a five-day bifurcated trial in July of 1995, the defendant was found guilty as charged. Jurors thereafter unanimously recommended imposition of the death penalty on each of three counts. The defendant now appeals.
Co-defendant Antoinette Frank, then a 24-year-old New Orleans Police Officer, and 18-year-old defendant Roger LaCaze were charged with murdering two members of the Vu family and a New Orleans Police Officer. The Vus owned and operated the Kim Anh Vietnamese Restaurant, located at 4952 Bullard Road in Eastern New Orleans. Officer Ronald Williams was working a security detail at the restaurant the night of the murders.
Evidence at trial established that Antoinette Frank had worked security at the Kim Anh and knew the Vu family. Around 9 p.m. on Friday, March 3, 1995, she called to inquire if she would be needed for the detail that night. Frank spoke with Chau Vu, the 23 year old daughter of the owner. Chau advised Frank that she was not needed, as Officer Ronald Williams would work from 11 p.m. until closing time, normally around 1 a.m. Frank completed her shift at the 7th District Police Station at 11 p.m. After changing clothes at home, she picked up the defendant and drove directly to the Kim Anh. She entered alone, asking for cold drinks for herself and a "nephew," who remained in the car. Frank spoke with Officer Williams, whom she knew, and with Mrs. Vu. Frank told Chau that she and her nephew were going to a midnight movie, and left with the drinks. Business was slow that evening, and the family decided to close early. Mrs. Vu went home, leaving her children to clean up. Frank telephoned a pick-up food order about fifteen minutes later to order some food, indicating that she had missed the movie. At this point there were six people in the restaurant: Chau, her 24-year-old sister Ha Vu, her 18-year-old brother Quoc Vu, and her 17-year-old brother Cuong Vu, a waitress named Tu, and 25-year-old Officer Williams.
Frank and a man she introduced as her nephew arrived at the restaurant minutes later and were the only customers. Their order was brought out in styrofoam containers, but Frank and her dinner companion decided to eat in the restaurant. Chau took close notice of Frank's dinner partner, later describing him to police as a short African-American with several gold front teeth, carrying a cellular phone.[4] Quoc, who was sweeping up around the tables, also made note of Frank's companion because he "kept staring" at Quoc. Frank and the man left without finishing their meal, exited the restaurant, but remained outside, talking. Chau went to attached grocery side of the building, unlocked the doors, and bid them good night. Frank asked if she would be needed Saturday night for the security detail. After checking with Officer Williams, Chau said no, that Williams would handle it. The two got in Frank's car and drove off.
Shortly thereafter, Frank and the man returned for a third time. Chau Vu and Quoc Vu were certain that the man accompanying Frank on her third trip to the restaurant was the man she introduced as her nephew, the same person who had eaten with her. Chau was frightened when she saw Frank approaching for the *1067 third time. Shouting to Officer Williams and Quoc not to open the doors, Chau gathered the money and ran to the kitchen where her sister Ha and brother Cuong were cleaning. As Chau hid the money in a microwave, she heard Quoc calling for her to come quickly to the front.
Quoc had interrupted his sweeping to watch Frank pull into the parking lot, maneuver her car, then exit and walk up to the glass door and begin shaking it. He called to Chau and moved toward the kitchen. Chau was leaving the kitchen area and coming towards him when, suddenly, Quoc saw Antoinette Frank there inside the restaurant. Frank began pushing Chau backward, forcefully and rapidly, toward the kitchen, saying that they needed to talk. Frank tried but failed to grab Quoc. Officer Williams was behind the bar. He had started moving in Chau's and Quoc's direction when Quoc heard "lots of gunshots" from that area.
Frank spun around and ran towards the bar and the front of the restaurant. Chau and Quoc ran in the opposite direction, going deeper into the building. They raced through the kitchen and into a large, room-sized cooler, situated between the kitchen and a small grocery the family also operated. As they ran they called to Ha and Cuong, who were by the stoves, to come along. But Ha and Cuong did not follow.
Chau testified similarly, that suddenly Antoinette Frank was inside the restaurant pushing her roughly toward the kitchen. It was at a point when she, Quoc, and Frank were together that Chau heard gunfire from the bar area where Officer Williams was located. When Frank left them, Chau, Quoc, and a helper hid in the cooler. Quoc turned off the cooler's lights as they entered and crouched down. From the darkened interior he and Chau were able to see into parts of the kitchen and bar through a small window. Chau saw Frank and her companion running back and forth, all over the kitchen. She saw Frank do something to the phone at the bar. Chau heard more gunfire but was unable to see who was shooting. Quoc observed Frank and her companion running around, rummaging, "digging in this little area where we always hide our money." Then she heard gunfire from the area where he had last seen his siblings, Ha and Cuong. Quoc was positive that the defendant was the man who was with Frank during the shooting.
Then Frank and the defendant were gone. From her vantage point inside the cooler, Chau looked through the windows of the grocery to the parking lot and watched Frank's car pull out and drive away. Yet she and Quoc hesitated to leave the relative safety of the cooler, uncertain what they would find and unsure whether Frank and the defendant had left or would return. Chau left the cooler on the grocery side to try to reach the telephone or her cellular phone at the bar. The telephone normally kept on the bar was gone. Going to retrieve her cellular phone, Chau spotted Officer Williams's body and lost all "confidence ... because the person that protects us is lying right there." She returned to the cooler with her cellular phone and attempted unsuccessfully to call 911. She finally reached a friend and asked him to relay news of the shooting and that an officer was hurt. The friend's call was received by 911 operators at 1:48 a.m.
While Chau was calling, Quoc left the cooler on the kitchen side to look for his brother and sister. He returned with news that both were lying in pools of blood. Quoc decided to try to reach a friend's house and call police from there. He left through the kitchen and back *1068 door. Quoc's call from his friend's home was received by 911 operators at 1:50 a.m.
The first police unit arrived on the scene at 1:52 a.m. Officers Wayne Farve and Reginald Jacques pulled into an empty parking lot. Jacques went around to the back, while Farve approached the front. A young female Vietnamese darted out of the building and ran toward him. Officer Farve also observed "a black female running a short distance behind [the Vietnamese female]," whom he recognized as another police officer, Antoinette Frank, who told him that the injured officer and perpetrators were "in the back." Farve entered the restaurant, with the semi-hysterical Vietnamese female right behind him. After quickly checking on the three victims, Farve made the appropriate notifications by radio then withdrew to the front of the restaurant. Arriving close behind him in another unit was Officer Yvonne Farve, who pulled in as her husband, Wayne, entered the restaurant. She attempted to follow him but was stopped by Chau who bolted from the building, crying and shouting. Yvonne Farve later testified that she "just grabbed on to me. So, I held her."
Chau had waited "so long" in the cooler for help to arrive. She saw one patrol car pull up but hesitated, not "want[ing] to go outside because I know Antoinette is police too...." When she heard more sirens approaching she felt safe enough to leave the building. Exiting on the grocery side, Chau began running toward the policeman. But from "somewhere[] Antoinette" appeared. Frank kept asking where she and her brother had hidden and what happen to her sister and other brother. Chau answered, "You was there. You know everything. Why you ask me that...." Frank reached out to grab her but Chau "saw the lady with the uniform [and] ran to her, and she hug me[.]" Later, after the Yvonne Farve calmed her down, Chau was able to relate that Antoinette and a short black man with gold in his teeth had come in and "were just shooting everybody."
Chau was unable make an identification from a photo line-up that morning. At trial she positively identified the defendant as Antoinette Frank accomplice. Quoc picked out the defendant's picture from a photo array in the hours following the shootings. At trial he, too, positively identified the defendant as the man who was with Antoinette Frank at dinner and at the time of the shooting.
Antoinette Frank was questioned on the scene and taken into custody. She gave several statements implicating the defendant. By 3:30 a.m. Saturday morning police were at the home of the defendant's mother. From there they proceeded to Michael LaCaze's West Bank apartment, where they took the defendant into custody. By approximately 5:00 a.m. he was in the homicide office where he gave verbal and taped statements placing himself inside the restaurant during the shooting, even while insisting that he had neither fired a weapon nor killed anyone.[5]
*1069 The bodies of Ha Vu and Cuong Vu were found next to the stoves, each shot multiple times. Ha Vu had been shot at least twice: once to the top of the head, which killed her instantly; and, once to the back of the head. There were minor wounds to the left knee and right arm which may have been caused by bullet fragments. Cuong Vu suffered four wounds, each of which would have been fatal. Two bullets were fired close together into the back of his head, exiting in the forehead. Their parallel trajectories suggested a rapid-fire type weapon. A third bullet struck a shoulder blade and exited in the chest area. A fourth bullet entered the victim's front chest, striking the liver and exiting the back. Two other wounds were superficial.
Officer Williams was shot three times. Forensic pathologist Paul McGary testified that the likely first shot was fired at close range to the right side of the victim's neck, under and beneath his ear, which severed the spinal column and exited just below his left ear. The bullet's trajectory was almost horizontal, slightly forward and upward. The victim would have been standing upright when this shot was fired. Death would have been instantaneous. The second wound was high on the neck at the base of the skull, with the bullet traveling into the head on an upward trajectory and exiting above the left ear. This would have been inflicted while the victim was down or falling down. Similarly the third bullet, which entered the right lower back and exited in the left chest area below the collar bone after passing through the right kidney, diaphragm, liver and right lung, was fired when Williams was down or falling down. The microwave oven where Chau Vu tossed the uncounted currency was empty. The murder weapon was never found.[6]
Three weeks after the murders detectives were contacted by the widow of Officer Williams, advising that someone had used her husband's gasoline credit card on March 4, the date of his death. Investigators had recovered the slain officer's identification folder, which most members of the force use in lieu of wallets. With the new information they realized that Williams also carried a wallet and that it and its credit cards had been taken after he was killed. Further investigation led detectives to the night manager of a Chevron Gas Station located a short distance from the home of the defendant's brother, Michael LaCaze, who told them that the defendant had made a credit card purchase around 2:30 a.m. in early March. Matching transaction records kept at the service station of "swipe card" purchases not requiring a signature with credit card billing information established that a credit card issued to Officer Ronald Williams was used to purchase $15.29 of gasoline at 2:29 a.m., Saturday, March 4. The manager positively identified the defendant as the person making that credit card purchase.
The prosecution's theory of the case was that Antoinette Frank became involved with the defendant in November of 1994 when she responded to a report of a disturbance and encountered a gunshot LaCaze. *1070 She followed his medical progress, then called and visited after his discharge from the hospital. Frank began giving him money, buying him gifts and clothes, and tried to get him a job. According to the defendant, Frank saw to it that he got a G.E.D. She also warned him that Eastern New Orleans was unsafe, as the person for whom he sold cocaine actually worked for 7th District police officers. Asked the nature of their relationship, defendant testified that he and Antoinette were friends.
By February of 1995, she purchased two cellular telephones, one for him and one for herself.[7] By this point the two were acting in concert while Frank was on duty. On March 2, for example, Frank responded to a report of an auto accident at Chef and Downman Streets. An African-American male rode in the front seat with her in the patrol unit. At Frank's direction the man got behind the wheel and repositioned the unit; at another point, he directed traffic. Other officers on the scene took him for an off-duty or plain-clothes police officer. Also on March 2, while still on duty and in uniform, Frank drove the defendant in her patrol unit to apply for a job. The following day, a uniformed Frank and a young African-American male with gold teeth were in Wal-Mart inquiring about 9mm cartridges. They left without making a purchase. That evening Frank and a young man she introduced as a "trainee" responded to a residential call in the 7th District.
In addition to their play-acting, prosecutors theorized that Frank was becoming increasingly angry over being cut out of what she considered an equitable share of the paid details at the Kim Anh Restaurant. The defendant told detectives that Frank resented the fact that her former partner, "Ronnie [Williams, was] always [] fuckin' over her.... He be messin' over her .... [and the Vus] do anything he say."
The defendant took the stand in his own behalf at trial. At the guilt phase he repudiated his statements to detectives. Instead, he explained to jurors, he and Antoinette Frank went to the restaurant twice, the last time to eat. Afterwards, Frank dropped him at his girlfriend's apartment around 12:20 a.m. Saturday morning. That was the last time he saw her. Minutes later his brother called, inviting him to play pool. His brother picked him up about 12:30 a.m. They picked up Angela, a friend of his brother's, then went to Mr. C's Pool Hall in Eastern New Orleans. They stayed until about 2:00 a.m. They left, dropped off Angela, then drove to his brother's West Bank apartment, arriving about 2:30 a.m. There the defendant remained until police arrived between 4:00 and 4:30 a.m. The defendant denied returning to the Kim Anh for a third time, denied any part in the killings, and insisted that his oral and taped statements to the contrary were products of police threats and coercion. He would confess again, he testified, because he "kn[ew] for a fact that New Orleans police get away with anything...."
The defense supported the alibi through testimony from the defendant's brother, Michael LaCaze. It did not produce Angela, however, and the manager of Mr. C's Pool hall testified unequivocally that Michael played pool late that Friday night *1071 without his brother. Further, the defendant contradicted the time line of his alibi when he testified that he was with Frank when she called the restaurant to order the food. Telephone company records established that the order was placed by cellular phone at 12:51 a.m. Saturday. This was some twenty minutes after he testified that Michael picked him up.
In addition to its alibi evidence, the defense raised for juror consideration the possibility that Antoinette Frank's brother, Adam Frank, was the accomplice. Crossexamination of Chau Vu established that Frank brought her brother to the restaurant when she worked a detail there. Later she began to drop Adam off at the restaurant, "just to hang around," while she performed her regular shift at the 7th District. Chau had a benign view of Adam Frank, however. He would come in, watch people having fun and enjoy the karioke. When Antoinette Frank got off work, she pick up Adam. The defense established that at relevant times Adam Frank had outstanding warrants for two counts of attempted manslaughter.
The defense also attempted to show that the wounds suffered by Cuong Vu and Officer Williams would have caused "back spatter" of blood on the shooter. The importance of this was the lack of blood spatter on the clothes of the defendant, which were seized at his arrest. However, the prosecution established through crossexamination of the defense blood pattern expert that defense counsel had neither provided any data on the murder weapon nor asked her to visit the scene, review photographs of the scene or the victims, or asked her to examine the defendant's clothes.[8]
The state conceded in closing that no one saw the shootings. On the other hand, it maintained that it had proved that Antoinette Frank did not kill Officer Williams. The evidence identified his killer as the defendant, Roger LaCaze. While Frank made a commotion by gathering people together, LaCaze sneaked in and shot Williams from behind.[9] The defendant then rummaged with Frank for money. The prosecutor also conceded that "we will never know [precisely] what happened" to Ha and Cuong Vu in the kitchen. Neither survivor, Chau or Quoc Vu, saw who shot their siblings. It appeared that only one gun was used and, the state argued, while reasonable to suppose that La-Caze kept and used the gun again, it made no difference who pulled the trigger on the Vus. That was "because whether that gun was in Antoinette Frank's hands or in [the defendant's] hand, [LaCaze] was there, he *1072 was helping, and he was intending to kill everybody, and he is guilty under the law of [p]rincipals." Jurors were urged to find LaCaze personally killed Officer Williams then participated as a principal in an armed robbery and the killings of the Vus.
Jurors deliberated seventy-nine minutes before unanimously finding the defendant guilty as charged on each of three counts of first degree murder.
At the penalty phase the state presented aggravating evidence of two unadjudicated crimes involving guns and violence to the person. It also presented victim impact testimony from Mrs. Vu, and the wife and mother of Officer Williams. Defense witnesses included the defendant's parents, the two mothers of his three children, and the pastor of a church he attended. All urged jurors to spare his life. The defendant took the stand and frankly begged for his life, telling jurors that while he was "guilty from being with Antoinette Frank," he "did not pull the trigger ... [and] ... did not kill them people." He begged for a chance to see his children, even from a jail cell.
In closing the state argued that the death penalty was appropriate, that the "mind of a person who could do that is unfathomable" and that jurors should consider the defendant's lack of remorse and denial of responsibility. Jurors were asked to show the same mercy as shown to the victims.
Defense counsel pleaded for his client's life. He argued that life imprisonment for an 18-year-old is a death sentence. He begged the panel not to make the defendant pay for what Antoinette Frank did. Counsel cautioned that "there may come a time in the very near future that other evidence might [show] that [LaCaze] may not have committed this crime," but a verdict of death would render that moot. In mitigation counsel primarily urged the defendant's youth, the lack of prior convictions, that he was under the influence and dominion of Antoinette Frank, and that he was a principal whose participation was minor.
Jurors interrupted deliberations to request further instructions on the statutory mitigating factors of the youth of the offender, and when the offender is under the influence or dominion of another. La. Code Crim. Proc. art. 905.5(c) and (f). The trial court hesitated to say anything which could be construed as a comment on the evidence, but told jurors that when legislators defined the mitigatory factors enumerated in La.Code Crim. Proc. art. 905.5, it did so "in a fashion for the jury to read into that what they believe that says." Further, "the weight that you are to give to the mitigating and aggravating circumstances is strictly the prerogative of the jury." Asked also to comment on the appellate process, the court responded that, "in this type of case the defendant will get an appeal," but that was an area "not [for jurors to be] considering...." Panel members resumed their deliberations and, thereafter, unanimously recommended the death penalty on each of three counts, finding the following statutory aggravating circumstances:

As to count one (Ronald Williams), jurors found that (1) the victim was a peace officer engaged in his lawful duties; (2) the offense was committed during the commission of an armed robbery; and that the (3) offender knowingly created a risk of death or great bodily harm to more than one person.

As to count two (Cuong Vu), jurors found that (1) the offense was committed during the commission of an armed robbery; and (2) the offender knowingly created the risk of death or great bodily harm to more than one person.

As to count three (Ha Vu), jurors found that (1) the offense was committed during *1073 an armed robbery; and (2) that the offender knowingly created a risk of death or great bodily harm to more than one person.
Defendant was then sentenced to death in accordance with the jury determination.

DISCUSSION
The principal issues of this appeal involve: (1) whether the evidence was sufficient to support defendant's conviction; (2) whether defendant adopted and litigated the motion to be declared indigent filed by Antoinette Frank; (3) whether defendant's borderline IQ and its effect on his ability to resist the influence and dominion of an older authority figure should have been considered by the jury during the penalty phase of the trial; and (4) whether the trial court gave adequate responses to the jury's questions on mitigating circumstances. After a thorough review of the record, we answer each of these in the affirmative and, finding no reversible error, affirm defendant's conviction and sentence. We now turn to the assignments of error raised by the defendant.
Assignments of Error XVII, XIX and XX
In related claims, the defense complains that the trial court diminished jurors' sense of responsibility by commenting on the appellate process and denigrating their verdict as a "recommendation;" that the court erred further when it instructed a deadlocked jury to resume deliberations until a verdict was reached, thus denying the defendant's right to a fair trial and reliable sentencing determination; and that the trial court erred in giving an inadequate response to jurors' request for further instructions on mitigating circumstances, the defense complains.[10]
The jury broke off penalty phase deliberations with two inquires. One was whether the court could "comment" on the appeal process. The trial court replied that it was "another layer of the system," about which jurors should not concern themselves.[11] While a defendant's right to a reliable sentencing hearing is compromised by references to appeal rights by the trial judge or prosecutor which convey the message that jurors' awesome responsibility is lessened by the fact at that their sentencing decision is not final,[12] brief reference to appeal rights in response to a juror's direct inquiry, as here, which emphasizes that such concerns are not for the panel, does not deprive a defendant of a fair sentencing decision.[13] This portion of the argument lacks merit.
There is no support for claims of a deadlocked jury. During the recharge, a juror *1074 asked, "How long are we allowed to deliberate tonight? If we come to a deadlock or we can't make a decision, how long do we have?" The judge replied, "[t]hat is a call that I have to make." Thereafter he asked jurors to "go upstairs and make an earnest effort to reach a verdict ... [to] go... and deliberate, and at some point I will check on you."
While a trial court has broad discretion in deciding whether the jury is deadlocked, and its decisions will not be overturned absent a palpable abuse of discretion,[14] in this case, there was no deadlock. This portion of the argument lacks merit.
The defendant's complaint, that the judge described the verdict as a "recommendation" which diminished jurors' sense of responsibility, is equally without merit. As a general principle, the failure to impress upon a jury the seriousness and finality of its decision denies due process.[15] Yet review of the voir dire argument of counsel[16] and the trial court's instructions in this case[17] offer no support for claims the jury did not understand the gravity of its duty or the finality of its decision, as this responsibility was impressed upon jurors repeatedly.[18] This portion of the argument lacks merit.
Next, defendant complains that the court did not properly reply to jurors' request for further explanation on statutory mitigating circumstances relating to "the youth of the offender at the time of *1075 the crime" and "the influence or ... domination of another person" under La.Code Crim. Proc. art. 905.5(c) and (f). To this inquiry, the judge replied in pertinent part:
... [T]he legislature, when it defined these activities herethese mitigating activities, they defined them in a fashion for the jury to read into that what they believe that says.
Now, I will make one comment. Okay. [Subpart (c)] you say, "The offense was committed while the offender was under the influence or under the domination of another person." That is one of the mitigating circumstances that you consider in making your decision. And, the weight that you are to give to the mitigating and aggravating circumstances is strictly the prerogative of the jury. The other one that you point out is [Subpart (f)], "The youth of the offender at the time of the offense[,"] and that again is the prerogative of the jury, and I cannot in my explanation start talking about something that will fade into the evidence in this case because that is not my prerogative.
The judge advised that he could not intrude into the evidence but did offer that the jury could read into the definition as they saw fit, determine what weight to accord mitigating and aggravating circumstances, and concluded by repeating that he could not comment on the evidence.
The Eighth Amendment does not require, even in response to a defendant's request, particularized and detailed jury instructions addressing the concept of mitigation generally, or the specific statutory circumstances urged by the defendant. It suffices that the instructions given by the trial judge allow jurors to consider and give effect to any and all mitigating evidence.[19] The test is whether a reasonable likelihood exists that jurors understood the trial court's instruction to preclude consideration of mitigating circumstances.[20]
Additionally, in the case of State v. Flowers,[21] this court held that in the context of a general instruction which emphasized the jury's authority to consider not only statutory mitigating circumstances but also any other relevant circumstances, any "further attempt to define or expand upon statutory mitigating circumstances may only lead to juror confusion and further efforts to define the definitions." Furthermore, a trial court has no independent affirmative duty to provide jurors any more of an explanation of mitigating circumstances than provided by La. Code Crim. Proc. art. 905.5. Moreover, even when specifically asked by a jury whether it must return a sentence of death if it finds one or more aggravating circumstances beyond a reasonable doubt, a trial court may respond by rereading a general charge which correctly informs jurors that they must consider all of the evidence in the case, including mitigating circumstances, before returning a sentencing verdict.[22]
In this case, jurors clearly were not confused about their duty to consider mitigating circumstances. The district court did not err in giving an incorrect statement *1076 of the law, but merely did not fully answer the jury's query. We cannot say that it is reasonable to believe that the jury was hindered in considering mitigating circumstances due to the court's response to its questions. The complained-of failure of the trial court to define or further address the mitigating circumstances of youth and influence or domination of another person does not rise to a level of reversible error in this case.[23] There are no legal definitions interpreting the language employed by the legislature in La.Code Crim. Proc. art. 905.5 and the trial court correctly informed the jurors that whether the defendant was a youthful offender and whether he acted under the domination of another person, as well as the larger question of whether these circumstances reduced the moral culpability of his acts, were theirs to determine according to their own experience and understanding. Any further definition or discussion may have led to jury confusion. For the above reasons, this portion of the argument lacks merit.

Assignment of Error IX
The defense complains that the proceedings were not adequately transcribed, thereby preventing judicial review based on a complete record of the case. Transcripts of various proceedings are missing, along with the objections, arguments and rulings contained therein. The defense maintains that reversal is mandated on these grounds.
A defendant convicted of a capital crime in which a penalty of death has been imposed has a right to appeal to this Court. La. Const. art. V § 5(D)(2). La. Const. art. I § 19 guarantees defendants a right of appeal "based upon a complete record of all the evidence upon which the judgment is based." While this court has reversed when material portions of the trial record were incomplete or not available,[24] a "slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal does not require reversal of a conviction."[25] Specific complaints about the record by the defense follow.

Pre-Trial Assignment of Error
The defense complains that transcripts of proceedings June 13, July 6, July 13 and July 14 are missing and necessary for his appeal. Yet minute entries show *1077 relatively minor events, favorably resolved to the defense.[26] Such inconsequential omissions merit no relief.
The defense also complains about gaps in the record preventing a full review. Only partial records exist for May 3, May 15 and June 19, it complains. The claims lack substance. Review of the minutes and available transcripts does not support contentions that these portions of the record are material or necessary to a full appeal.[27]

Voir Dire Assignment of Error
The defense claims the record of voir dire is incomplete, in that "[a]t least twenty-two different unidentified prospective jurors made comments thatto varying degreeswould have supported a challenge for cause." Given the nature of the case, it was critical to test jurors' links and relationships with police officers. The defense contends that review of this critical portion of trial is impossible on the present record.
The complaint lacks merit. Because voir dire was intended to cover the entire 120-person venire, responses often were recorded from "unidentified" jurors not among the twenty identified panelists in the jury box. At such times the trial court listened to the exchanges until some threshold was reached, indicating a possible cause challenge. At that point, the trial court made note of the juror's name. Later, if the juror were called for one of the panels and challenged, the judge would refer to his own notes when making a ruling. The venire was not an anonymous sea of faces as many had been in a previous venire examined by ADA Woods in an earlier case. A through reading of the voir dire supports a conclusion that any juror exhibiting a basis for disqualification was removed for cause. Jurors were questioned about links to law enforcement, and hints that active duty officers or their spouses or relatives may have served does not state a basis for reversal, as the standard is whether the person can impartially carry out the duties and obligations of a juror in the particular case.[28] On the showing made, no relief is due.

Penalty Phase Assignment of Error
The defense argues confusion of witnesses and transcripts requires reversal, that some transcripts purport to be duplicates, *1078 but do not match, and that the condition of the record raises grave doubts about any court's ability to review this capital proceeding.
The claims lack merit. This court will go as far as agreeing the transcripts are out of chronological order, are duplicated, and are very difficult to read. However, the defendant does not show that any of the testimony is missing, either at the hearing to decide admissibility of the unadjudicated crimes evidence or the penalty phase itself. This part of the argument lacks merit.

Post-Trial Assignment of Error
Defendant complains that the transcript of a hearing on a new trial motion is missing, along with "[all] of the other posttrial hearings." The hearing on a new trial motion, held August 14, 1995, is before this court, raised under Assignment of Error XXVII and found to lack merit. As for the "other" post-verdict hearings, the defense does not identify which it is interested in or even allege that transcripts are "material" to proper appellate review. This portion of the assignment lacks merit.
This condition of the record in this case falls between that in Landry,[29] in which the record rendered voir dire unreviewable and contained different versions of the defendant's criminal history and victim impact statements being presented at the penalty phase, and Brumfield,[30] in which it was found that unrecorded bench conferences absent a showing of prejudice were immaterial to a proper determination of the appeal. Regarding all defense complaints made about the record in this case, we agree that condition of the record is abysmal. Nevertheless, it contains all significant portions of the proceedings complained of by counsel and it thus provides a basis for the full judicial review guaranteed in Louisiana. No relief is due.

Assignments of Error X and XIV
The defense claims that retained counsel Willie Turk was ineffective. Current counsel argues that trial counsel was unprepared, did not lodge appropriate objections, and his performance was so lackluster that this court should reverse on the present record and not waste judicial resources on a remand for an evidentiary hearing. Specific claims are that Turk filed only three pre-trial motions; failed to adequately litigate identification; abdicated his obligations at voir dire; and, did not guard against hearsay or prosecutorial misconduct.
A criminal defendant is guaranteed the effective assistance of counsel. U.S. Sixth Amendment; La. Const. art. I § 13. To prevail on a claim of ineffective assistance, a defendant must demonstrate (1) that his attorney's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that counsel's errors or omissions resulted in prejudice so great as to undermine confidence in the outcome.[31] The Sixth Amendment does not guarantee "errorless counsel [or] counsel judged ineffective by hindsight," but counsel reasonably likely to render effective assistance.[32] Judicial scrutiny must be "highly deferential" and claims of ineffective assistance are to be assessed on the facts of the particular case as seen from "counsel's perspective at *1079 the time," hence, courts must indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[33]
Claims of ineffective assistance are generally relegated to post-conviction, unless the record permits definitive resolution on appeal.[34] The same approach is followed in capital cases. When the record permits, this court will reach the merits of claims about counsel's performance and grant relief when appropriate.[35] However, when the record does not permit a reasoned determination based on a full evaluation of arguably meritorious claims in a capital case, this court has conditionally affirmed and remanded for an evidentiary hearing on allegations of ineffective assistance.[36] We now will evaluate whether the record permits a full evaluation of these claims.

Assignment of Error Regarding Few Pretrial Motions
Claims that Turk was derelict because he filed only one single-line motion to sever, and two motions for subpoena deuces tecum lacks factual support. Counsel for co-defendant Antoinette Frank filed numerous motions on May 15, 1995, and the trial court granted Turk's request to adopt them.[37] While Turk did not press for individual voir dire, no "special circumstances" were present as would support this mode of voir dire.[38] As claimed, he did not challenge the admissibility of victim impact evidence, but had full notice and the state's presentation of such was modest. To his support, Turk did contest, unsuccessfully, admission of the unadjudicated crimes evidence at the penalty phase. No error or dereliction by counsel is discerned. This part of the assignment lacks merit.

*1080 Voir Dire Assignment of Error

The defense complains of a total collapse by defense counsel, arguing that Turk abdicated his duty by turning voir dire over to "an attorney who is now suspended from practice[.]" At a bench conference during the state's examination of the first panel, Turk advised the court and prosecutors that Ernest Caulfield would be assisting in jury selection. Caulfield thereafter conducted the defense voir dire, although Turk joined bench discussions for cause challenges and strikes. The defense describes voir dire as an "unmitigated disaster," (emphasis omitted) and argues that jurors were not queried regarding mitigating circumstances, their attitudes toward law enforcement, eye witness identification, or an accused's right to silence. Furthermore, the defense argues that Caulfield "repeatedly failed to procure responses from any of the jurors" and that his peremptory strikes were haphazard.[39]
The defense overstates these claims. The entire venire was assembled in the courtroom, where the trial court announced that "we are going to pick a jury in here today" and to "pay close attention," so that "we can cut down on ... redundant... questions[.]" In fact, a jury was empaneled by 2:00 p.m. on the first day of voir dire. The defense offers nothing to support its claim about Caulfield's status but, as contended, the attorney did not discuss mitigating circumstances and sprinkled liberally throughout his examination were open-ended rhetorical queries eliciting little response. One of his peremptory strikes was unusual.[40] A lack of questions on eye-witnesses raises no alarms, however, and not examining jurors on an accused's right to silence means little in a case in which the defendant testified at both phases of trial.
The venire was extensively questioned by the state, aided by juror questionnaires and the fact that many jurors had been examined in an earlier capital case by the same prosecutor, circumstances which compensates for defense shortcomings.[41] Neither side discussed' mitigating factors or, for that matter, aggravating circumstances. While silence is a problematic tactic for the defense at voir dire of a capital case, still, counsel may have made a strategic decision not to discuss aspects relating to the penalty phase to instill confidence in the defense alibi evidence. The state's reason for avoiding the topic was laid out by Assistant District Attorney Woods, who explained that "we are only *1081 concerned with the guilt or innocence [at this stage,]" and if a guilty verdict is returned, "then we move on to discuss other aspects of this that we have to present."
More generally, when a juror signaled a question or problem, questioning would continue until the matter was resolved and/or the judge would note the juror's name for later reference when challenges were issued. Bench conferences at which challenges were raised and ruled on were recorded and are before this court.[42] The attorneys also were permitted to backstrike. While Caulfield's performance may have been less-than-stellar and the speed of voir dire may give pause, on balance and particularly on this record, it cannot be concluded that jurors were misinformed about any single issue with respect to the guilt phase of trial. Even if counsel's conduct of voir dire amounted to professional dereliction, the lack of apparent prejudice dooms claims of ineffectiveness rooted in this part of trial. Therefore, this part of the assignment lacks merit.

Assignment of Error Regarding Identifications
As claimed, counsel did not move to suppress the identifications of Chau Vu, Quoc Vu, and John Ross. A state answer to a bill for particulars and discovery, filed May 15, 1995, advised that LaCaze had been identified by "Quol Va and Chan Vu." At motion hearings on May 26, attorney Turk "waived all motions as to the identification[.]" An amended state answer, datestamped by the Orleans Criminal District Court's clerk's office June 1, 1995, advised that the defendant had been identified by "Quol Vu and Mr. John Ross by photo." There are no transcripts from May 26 (assuming the date is correct). The record offers no insight into Turk's decision to waive "all motions as to identification," and the defense does not explain how the attorney should have set about suppressing a pre-trial identification Chau Vu never made.[43]
No basis for suppressing the pre-trial identifications of Quoc Vu and John Ross appears. Counsel may have concluded as much, and made a tactical decision not to expend effort on a losing cause. The matter cannot be resolved on this record. Therefore, this part of the assignment lacks merit.

Objections to Hearsay and Prosecutorial Misconduct
The defense complains Turk did not object to prejudicial hearsay and state misconduct.[44] The cited examples either are not hearsay, show little likelihood of prejudice or appear to be a matter of strategy and, thus, do not reflect ineffective assistance. Complained-of portions of Detective Demma's testimony concerns statements made by John Ross and Quoc Vu at photo arrays. Chau Vu's statements were cumulative of her own testimony and present no prejudice. Ross's statements were non-hearsay.[45] As for admission of *1082 911 tapes and dispatchers' testimony, having state evidence and witnesses establish a time line against which to later present an alibi defense is arguably a strategic decision, not subject to second-guessing.[46] The cited testimony by Chau Vu, relating a talk she had with Officer Ronald Williams about Adam Frank, was hearsay but arguably beneficial to the defense, as it provided an evidentiary basis to suggest that another male, perhaps Adam, had been with Antoinette during the rampage through the restaurant. No error is apparent. This part of the assignment lacks merit.
Given the deferential review required, none of the claimed errors or omissions by counsel necessitates a remand for an evidentiary hearing. Even if counsel's conduct was professionally deficient in the guilt phase, no prejudice is demonstrated. Without that, the defense cannot make the dual showing necessary to prevail on an ineffectiveness claim. This part of the assignment lacks merit.
For the above reasons, the assignment lacks merit.

Assignment of Error No. XXV
The defense argues that it would violate the state and federal guarantees against cruel, excessive, and unusual punishment found in La. Const. art I, § 20 and the United States Eight Amendment to execute LaCaze, a "17-year-old" "mentally retarded" "child" with an IQ of 71. Appellate counsel concedes that execution of the mentally retarded is not per se unconstitutional.[47] But when the death penalty has been upheld, he argues, the defendant has been able to place his mental status before jurors at the penalty phase. He argues that in this case, jurors did not consider LaCaze's mental retardation. Given the lack of money for mitigation experts and the trial court's inadequate response to the jury's requests for a further explanation of mitigating factors, the defense contends that executing LaCaze would be a travesty of justice.
The arguments are flawed in several respects. First, the defendant was born August 13, 1976. Thus, he was 18 years and 3 months old when he met Antoinette Frank, and 18 years and 7 months old when he participated with her in the triple killings in the Kim Anh Restaurant in March of 1995. As for "mental retardation," while appellate counsel speaks as though it were fact, the available record evidence reflects that LaCaze has an overall IQ score of 71, which forensic psychologist Raphael Salcedo testified was in the borderline range, with mild retardation beginning *1083 at an IQ score of 69. Psychiatrist Kenneth Ritter's examination found no mental disease or disorder and attributed LaCaze's IQ score of 71 to poor school performance. The defense is correct as far as it contends that mental retardation will not per se invalidate a death sentence. Nor will LaCaze win sympathy by erroneously claiming to have been a "child," either at the time of the murders or now. Such contentions lack merit.
On the other hand, LaCaze was absolutely entitled to have jurors consider his low IQ, as well how that may have affected an ability to resist the influence and domination of an older woman. A capital defendant may introduce virtually any evidence in mitigation at the penalty phase of a capital trial.[48] Trial attorney Turk's decision not to have his client evaluated, thus foregoing discovery of LaCaze's low IQ before trial, is reasonable precisely to the "extent that reasonable professional judgments support the limitations on investigation."[49] This, like other questions about the performance of trial counsel, cannot be resolved on the present record and would be best reviewed upon post conviction relief.

Capital Sentencing Review
Pursuant to La.Code Crim. Proc. art. 905.9 and Louisiana Supreme Court Rule XXVIII, this Court reviews every sentence of death to determine if it is constitutionally excessive. In making this determination the Court considers whether the sentence was imposed under the influence of passion, prejudice or arbitrary factors; whether the evidence supports the jury's findings of statutory aggravating circumstances; and, whether the sentence is disproportionate, considering the offense and offender.
Defendant Roger Joseph LaCaze is an African-American male, and was 18 years old at the time of the offense. He and an older brother, Michael, were raised by a single mother until each attained the age of 17, because she disapproved of their lifestyles. The pre-sentence investigation report in the record is unclear, but it appears that the defendant had no juvenile record and only two arrests as an adult prior to this offense.[50] The state presented evidence at the penalty phase of unadjudicated criminal conduct in November of 1994 involving an armed robbery and attempted murder of Derrick Jefferson, and an aggravated battery of Anthony Wallace in February of 1995. The defendant did not complete high school. He has never married but is the father of three children by two mothers. In his testimony, the defendant admitted to using and selling cocaine.
The victims in this case were Vietnamese siblings, Ha and Cuong Vu, and, a white police officer. However, race does not appear to have played a part in the killings. Rather, it appears that the defendant joined with co-defendant Antoinette Frank, herself a police officer, who was disgruntled over not getting enough paid details at the Kim Anh Restaurant where the armed robbery and murders occurred.
*1084 At the penalty phase, defendant presented testimony from his mother, father, a family friend, the mothers of his children, and a pastor. He took the stand on his own behalf. All asked the jury to spare the defendant his life. Mitigating factors urged were his youth; lack of significant prior criminal history; that the offense was committed while he was under extreme mental or emotional disturbance, as well as the under the influence and dominion of another; that he did not appreciate the criminality of his conduct; and, that he was a principal whose participation was minor under La.Code Crim. Proc. arts. 905.5(a), (b), (c), (e), (f), (g).

Passion, Prejudice or Other Arbitrary Factors
In his Capital Sentence Review Memorandum, Defendant claims that his death sentence is excessive and was improperly imposed. Doubts about counsel's performance at the guilt and penalty phases of trial give pause but must await post-conviction. However, all of these issues were addressed in depth above in the individual assignments of error and found to be without merit.

Aggravating Circumstances
The jury returned separate verdicts finding that as to all three victims that the offense was committed during the commission of an armed robbery and that the offender knowingly created the risk of death to more than one person. As to Ronald Williams, jurors additionally found that the victim was a peace officer engaged in his lawful duties. La.Code Crim. Proc. art. 905.4(A)(1), (2), (4).
Proof of each of the aggravating circumstance was established beyond a reasonable doubt. The evidence, including the defendant's own confessions and penalty phase testimony, demonstrates that he and co-defendant Antoinette Frank armed themselves and entered the restaurant, where they shot and killed three people, and stole money, a telephone, a wallet, and credit cards. The taking of something of value from the person of another or his immediate control while armed with a dangerous weapon defines an armed robbery. La.Rev.Stat. 14:64. Given the result it cannot be debated that the defendant and Frank, in a single consecutive criminal episode spanning about fifteen minutes, created a risk of multiple deaths or great bodily injury by repeatedly firing semi-automatic weapons inside a family-owned business establishment occupied by six people. La. C.Cr.P. art. 905.4(A)(4).[51] Lastly, Officer Williams was in uniform and was working a paid detail when he was killed and thus "was engaged in the performance of his lawful duties." State v. Berry, 391 So.2d 406, 412 (La.1980)(peace officer working paid details protects citizenry and prevents or deters violent crime is performing *1085 his lawful duty for purposes of La.Rev.Stat. 14:30(A)(2)), hence, satisfies the aggravating circumstance defined in Art. 905.4(A)(2). State v. Broadway, 96-2659, p. 27 (La.10/19/99), 753 So.2d 801, 819; Brumfield, 737 So.2d at 671, n. 6. Consequently, Defendant's sentence of death is firmly grounded on the finding of these aggravating circumstances.

Proportionality
The federal constitution no longer requires proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nevertheless, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Miller, 99-0192, p. 30 (La.9/6/00), 776 So.2d 396, 414. Pursuant to La. S.Ct. Rule 28, § 4(b), the Orleans Parish District Attorney's Office filed with this Court a list of each first degree murder case tried after January 1, 1976, in the parish. The only two comparable cases in Orleans Parish are those of the defendant's codefendant, Antoinette Frank, and Phillip Anthony. As to Frank, this Court recently affirmed conviction but remanded for a determination of indigency and entitlement to state-funded expert assistance for the sentencing portion of trial. State v. Frank, 99-0553, p. 22, 803 So.2d 1, 20-21. As to Anthony, this Court affirmed the defendant's conviction and sentence of death for the notorious triple homicides committed in the Pizza Kitchen restaurant in the French Quarter. State v. Anthony, 98-0406 (La.4/11/00), 776 So.2d 376.
On a state-wide basis this Court has affirmed capital sentences in a variety of settings involving multiple deaths or when a defendant creates the risk of death or great harm to more than one person. State v. Broaden, 99-2124, pp. 27-28 (La.2/21/01), 780 So.2d 349, 366 (victims were shot on the street in the same neighborhoods minutes apart, an accomplice using small-arms fire, the defendant using a sawed-off shotgun placed directly against the victims' skulls); State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162 (exemployee returns to restaurant, shoots three and kills two people); State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8 (mixed-race coupled stabbed to death in their home during an aggravated burglary); State v. Tyler, 97-0338 (La.9/9/98) 723 So.2d 939 (defendant entered a Pizza Hut armed with a .22 caliber revolver, ordered the three employees to lie face down on the floor in the cooler after robbing them and shot each one in the back of the head); State v. Baldwin, 96-1660 (La.12/12/97), 705 So.2d 1076 (defendant shot and killed his estranged wife and three men who were present at the time with a sawed-off shotgun); State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922 (murder-forhire scheme resulting in death of defendant's wife and a visiting friend); State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116 (defendant murdered his wife and severely wounded her mother); State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364 (ex-employee returns to restaurant, kills one employee and attempts to kill others).
Considering the foregoing, the death sentence imposed in this case does not appear disproportionate. Evidence at trial established the cold-blooded and callous disregard for human life exhibited in these killings. Nothing contained in the post trial documents filed pursuant to La. S.Ct.R. 28 warrants reversal of Defendant's death sentence.

DECREE
For the reasons assigned herein, Defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the Defendant fails to petition timely *1086 the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the Defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. Rev.Stat. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the Defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev. Stat. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
JOHNSON, J., dissents and assigns reasons.
CALOGERO, J., concurs and assigns reasons.
CALOGERO, Chief Justice, concurs and assigns reasons.
I concur in affirming the conviction and sentence. Although the trial court's response to jurors' request for further explanation regarding mitigating circumstances at the defendant's penalty phase did not transgress minimal constitutional requirements, see Buchanan v. Angelone, 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998); State v. Howard, 98-0064 (La.4/23/99), 751 So.2d 783, I write separately to point out that it is preferable to educate capital jurors on the full range of their sentencing options. The trial court should, therefore, answer comprehensively any questions posed, as well as answer to the extent possible the unstated premises of questions raised, rather than require lay panel members to articulate precisely the difficulty that prompts them to interrupt deliberations to seek direction from the trial judge.
As the majority recognizes, jurors in this case "essentially asked how they could give effect to the statutory mitigating circumstances they were contemplating...." Ante, p. 1075, n. 22. Although the trial judge did not give an incorrect answer to the jurors' inquiry, the better response would have included an explanation that, in order to return a verdict of life imprisonment, a mitigating circumstance need not be found by any number of jurors, jurors need not agree on the same mitigating circumstance, and no presumptions or burdens of proof with respect to mitigating circumstances exist. See State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162; State v. Jones, 474 So.2d 919 (La.1985). In addition, jurors should have been made aware that a life sentence remained a viable option even in the absence of any mitigating evidence and that no juror is ever required to return the death penalty under any circumstances. State v. Martin, 550 So.2d 568 (La.1989); see also State v. Watson, 449 So.2d 1321 (La.1984).
JOHNSON, J., dissenting
I agree with the majority's decision to affirm defendant's conviction. However, for the reasons that follow, I would vacate defendant's sentence and remand this matter to the trial court for a new penalty phase hearing, a clarification regarding a ruling of competency, and a determination of whether defendant adopted an indigency motion filed by his former co-defendant.
First, defendant was absolutely entitled to have jurors consider his borderline IQ, as well as how that may have affected his ability to resist the influence and domination *1087 of an authority figure who was considerably older than he. The evidence suggests that defendant was acting under Antoinette Frank's dominion and control on the night of the murders. In State v. Sonnier, 380 So.2d 1 (La.1979), the court reversed the defendant's death sentence, finding that the defendant was acting under his brother's influence when he participated in the murders of two young lovers. The court pointed out that defendant's brother was the one who initiated the excursion that night. The brother also suggested harassing the couple and approached the victims' car, impersonating a police officer. It was also the brother who decided to kill the young couple to avoid going to prison. The court stated:
Whatever resistance [the defendant], whom the prosecution characterized as a mental and physical weakling, might have offered against his armed brother at this point would surely have been ineffective.
In this case, the evidence indicates that Frank masterminded the entire plan to rob the Kim Ann restaurant. It was Frank who worked security details at the restaurant and had intimate knowledge of the restaurant's routine. She was familiar with the layout of the restaurants and with its owners. It was Frank who stole the key, which allowed her and defendant to enter the building that night, and it was Frank who knew the routine of the restaurant and where the money was kept. It was also Frank who became angry and held a grudge against Officer Williams, her former partner, because of her belief that he was cutting her out of paid security details at the restaurant. Finally, it was Frank who provided defendant with a gun on the night of the murders.
Next, defendant is entitled to another penalty phase hearing because of the trial judges inadequate response to jurors' request for a further explanation regarding mitigating factors. During the penalty phase, the jury sought an explanation from the trial court on those statutory mitigating circumstances relating to "the youth of the offender at the time of the crime" and whether the "offense was committed while the offender was under the influence or... domination of another person." LSA-C.Cr.P. art. 905.5(c), (f). The judge advised that he could not intrude into "something that starts to get into the area called `evidence,'" but could say that the legislature defined these circumstances "in a fashion for the jury to read into that what they believe that says." He also told jurors they were to determine what weight to accord mitigating and aggravating circumstances, and concluded by repeating that they could not "start talking about something that will fade into the evidence...."
In State v. Martin, 550 So.2d 568, 574 (La.1989), this court held that a new sentencing hearing was required, as the court's failure to answer the jury's questions could have led a reasonable juror astray with respect to the necessity of first finding a mitigating factor before recommending a life sentence. In this case, the trial court "did not give an incorrect statement of the law;" however, it did not fully answer the jury's query. The trial court failed to explain to the jury that there need be no "findings" or unanimity with respect to mitigating factors. Wessinger, 736 So.2d at 193. Jurors were not told that there are no presumptions or burdens of proof with respect to mitigating factors. Wessinger, citing State v. Jones, 474 So.2d 919, 932 (La.1985), cert. denied. 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986). Nor was it made clear that the jury need not find a mitigating factor in order to recommend a life sentence. Martin, supra, 550 So.2d at 574.
*1088 In my mind, the jurors' request for further instruction from the court essentially asked how they could give effect to the statutory mitigating circumstances they were contemplating during deliberations. The trial court's rambling response is reminiscent of the circumlocutions of trial courts faced with jury requests for instructions on the possibility of commutation, pardon, and parole of life sentences at a time when mere mention of the subject in a capital case invited reversible error. See, e.g., State v. Messiah, 538 So.2d 175, 182-83 (La.1988). Furthermore, the jury's request went to the heart of the capital sentencing scheme in Louisiana. There are no legal definitions interpreting the language employed by the legislature in LSA-C.Cr.P. art. 905.5, and the trial court started off in the right direction by informing jurors, that whether defendant was a youthful offender and whether he acted under the domination of another person, as well as the larger question of whether these circumstances reduced the moral culpability of his acts, were theirs to determine according to their own experience and understanding. However, the trial court should have gone farther and made clear that jurors need not "find" those mitigating circumstances proved by any quantum of evidence to return a life sentence and, in fact, remained free to return that non-capital sentence even if they found no "evidence" of mitigation.
These distinctive and essential aspects of Louisiana's capital sentencing scheme afford jurors not simply the opportunity to consider mitigating evidence but also the greatest means of giving effect to their views (or at least to the view of one juror) that the offender's moral culpability for the offense does not warrant imposing the most severe sanction under the law. "`Accurate sentencing information is an indispensable prerequisite to a reasoned determination,'" Martin, supra at 574, (quoting Gregg v. Georgia, 428 U.S. 153, 190, 96 S.Ct. 2909, 2933, 49 L.Ed.2d 859 (1976)). Thus, in my view, jurors in this case were inadequately informed with respect to mitigating factors, and the failure to fully explain this component of their decisionmaking injected arbitrariness into the proceeding and prevented a reliable sentencing determination.
Moreover, I believe that a remand is necessary to clarify whether a ruling of competency has been issued. The trial judge ordered a post-verdict competency evaluation to allow a "lunacy commission [to] examine the defendant for his compet[e]nce and so that his IQ might be determined." The transcript of the hearing held on September 5, 1995 reflects that "Dr. Raphael Salcedo" appeared and was questioned exclusively by the trial judge. Defense counsel was not present, nor is there an indication that defendant was present. The trial judge acknowledged defense counsel's absence on the record but apparently discerned no impediment to proceeding, as he remarked to the doctor that the hearing "is really not adversarial."
Any unresolved question about a defendant's capacity to proceed precludes imposition of punishment. It is possible that the required ruling of competency has been issued. However, the record does not so reflect. Clarification can only come by remanding this case, to allow the district court to sort matters out.
Finally, this case should be remanded to allow the trial court to determine whether defendant adopted the indigency motion filed by Antoinette Frank. In State v. Frank, 99-0553 (La.4/16/01), 803 So.2d 1, this court remanded the case because the trial court failed to allow Frank "the opportunity to make a showing [of indigency] under [State v.] Touchet [93-2839 (La.9/6/94), 642 So.2d 1213, 1216] as to her need for state-funded assistance for the purpose of presenting ... mitigating evidence." Frank at 11.
*1089 Defendant contends that he adopted all motions filed by Frank prior to the severance of the cases. However, the record is unclear regarding the date Frank's motion for a determination of indigency was filed. LSA-C.Cr.P. art. 842 provides:
If an objection has been made when more than one defendant is on trial, it shall be presumed, unless the contrary appears, that the objection has been made by all the defendants. (Emphasis added).
I believe that defendant should have an opportunity to show that he adopted Frank's motion for a determination of indigency. Therefore, the proper disposition would be to remand this matter to the trial court to determine when Frank's motion to be declared indigent was filed and whether that motion was adopted by defendant herein. If the trial court determines that defendant adopted the motion, defendant must be allowed the same opportunity to show whether he is entitled to state-funded expert assistance for the sentencing phase. Additionally, if the court determines that defendant met his burden of proving that he is so entitled, defendant will have the benefit of that expert assistance at a new sentencing phase.
NOTES
[*] Retired Judge Robert L. Lobrano, assigned as Justice Pro Tempore, participating in the decision.
[1] La. Const. Art. V, § 5(D) provides that a case is appealable to the Louisiana Supreme Court if a defendant has been convicted of a capital offense and a penalty of death has been imposed.
[2] Several assignments of error were not discussed in this opinion because they do not represent reversible error and are governed by clearly established principles of law. They will be reviewed in an appendix which will not be published but will comprise part of the record in this case.
[3] Pleadings and transcripts contain different versions of the defendant's name. He was indicted as "Roger LaCaze." Some volumes of the trial record reflect the defendant's name as "Rogers LaCaze." The defendant himself signed a rights-of-arrestee card as "Rogers LaCaze."
[4] On the first day of trial the defendant was asked to stand and display his (gold) teeth for jurors. Later, Antoinette Frank was shown to the jury.
[5] The defendant told detectives that after the shootings Frank dropped him off at his girl friend's apartment on Cindy Place in Eastern New Orleans, a short distance from the Kim Anh restaurant. Frank told him not to worry, that she would return and take care of things She would go to the 7th District and report that several black masked men broke through the back door of the restaurant and started shooting. She would be able to do this because "the[re] ain't no way ... [that anyone] would ever believe she had anything to do with it." Frank did return to the 7th District Station House but only to swap her personal automobile for a patrol unit, which she used to return to the scene, after taking the precaution of parking in an adjacent parking lot. Frank either hid near the front of the restaurant or perhaps was inside when Chau Vu broke cover and ran for the safety represented by Officers Farve.
[6] It is unclear how many guns were used. Police recovered 9mm casings, 9mm bullets and 9mm bullet jacket fragments from the scene and autopsies. While New Orleans Police Firearms Examiner John Treadaway matched jacket fragments, a bullet from the scene and a bullet from the autopsy as being fired from one 9mm semi-automatic weapon, and while he found that all casings were fired from one 9mm semi-automatic, he could not could not conclude that all casings, bullets and fragments were fired from the same weapon.
[7] Telephone company records show that Frank bought two cellular telephones, 858-6986 and 858-6987. Billing records show a series of calls from 858-6986 (LaCaze) to 858-6987 (Frank) at 1:26 a.m., 1:28 a.m., 1:44 a.m. and 1:49 a.m. on March 4, or the approximate time that Frank and LaCaze were terrorizing the occupants of the Kim Anh and making their get-away.
[8] The expert also retreated from her conclusions with respect to Cuong Vu's wounds, after learning that the pathologist determined that these were not close wounds and thus would not likely produce back-spatter. Told that the pathologist felt that little back-spatter would have been produced by the neck wound to the officer, the defense expert held to her view that a shooter within four feet of a gunshot wound would receive an amount of back-spattered blood. She conceded that a definitive assessment would depend on an examination of the scene or photographs of the area, neither of which was requested by defense counsel.
[9] The defense did not stress the implausibility of the 5'2" 135 lb. never-before-convicted 18-year-old defendant sneaking up on the fully armed 6'½" 225-pound policeman in the manner suggested by the state. In the state's version, the defendant would have had to have entered the restaurant, crossed to the bar, leaned up and over the bar as well as some looseleaf binders piled atop the bar and, still unnoticed, brought the gun within 18 inches of the officer's neck and, holding it parallel to the floor, shot him under the right ear. The victim's immediate collapse also would have made it difficult for the shooter in the state's version to have produced the other two wounds sustained by the officer.
[10] As an initial matter, there was no defense objection to any of these alleged errors during the trial. However, as this case was tried before the decision in State v. Wessinger, 98-1234, p. 20 (La.5/28/99), 736 So.2d 162, 181 (on a prospective basis, the court will no longer consider alleged errors in the penalty phase of a capital trial absent a contemporaneous objection), the failure of counsel to object does not preclude review.
[11] Continuing, the trial court stated,

Now, I will tell you that the defendant is entitled to an appeal. As a matter of fact I will even go further than that and I'll say in this type of case the defendant will get an appeal. But, I think that is as far as I can go, and that really is not your prerogative to be considering the appeal and the appellate process. Just like you shouldn't be the prosecutor, or the defense attorney, or make the evidentiary calls. Your job is to focus on the sentencing hearing, the aggravating and mitigating circumstances that are involved in this case and weigh that and make your decisions solely on that and what has been introduced in this case.
[12] Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
[13] State v. Deboue, 552 So.2d 355, 365 (La. 1989)(judge's "succinct and legally accurate response, acknowledging the commonly known fact that defendant had a right to an appeal ... [did not lead] the jury to believe that its responsibility for sentencing was in any way diminished.").
[14] La.Code Crim. Proc. art. 905.8; State v. Lowenfield, 495 So.2d 1245, 1259 (La.1985); State v. Monroe, 397 So.2d 1258, 1271-1272 (La.1981).
[15] State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703, 722-723.
[16] With a 120-person venire in the courtroom, and having called the first panel of twenty venirepersons to the jury box for examination, the district court advised the assembled prospective jurors:

[B]ut, in a first degree murder [case] because of the possible penalty here, [it] is the jury ... if they come back with guilty as charged, that is the only time in Louisiana law that the jury recommends a sentence. And, they can recommend a sentence of death or life imprisonment without benefit of probation, parole or suspension of sentence. And, that will only occur if there is a guilty verdict in the first phase.
So, in other words, it is a bifurcated trial. We will try the question of guilt ... first, and if the defendant is found guilty of first degree murder, as charged, then twelve people who are sitting on the jury will make the selection of whether the person receives a sentence of death or life imprisonment.
Jurors were queried frankly by the state on an ability to vote for the death penalty. The state plainly informed jurors, "If this jury comes back with a verdict of guilty as charged, I am going to ask you to put him to death."
[17] In opening remarks to jurors at the penalty phase the state told jurors:

As you recall, I explained to you that if ... the jury decided that the defendant was guilty of first degree murder that I would come back... that we would come back ... and ask you to unanimously recommend that [defendant] be put to death. We are at that time now. As the Judge has explained to you ... each one of you individually must now consider what the appropriate penalty is for what he has done.
The district court's penalty phase charge left no doubt about jurors' sentencing responsibility:
Ladies and gentlemen, having found the defendant guilty of first degree murder, you must now determine whether [he] should be sentenced to death or to life imprisonment without benefit of probation, parole, or suspension of sentence....
[18] State v. Wessinger, 736 So.2d at 188; Williams, 708 So.2d at 722-723.
[19] Buchanan v. Angelone, 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998).
[20] Buchanan, 522 U.S. at 277-79, 118 S.Ct. 757; see State v. Howard, 98-0064, p. 31 (La.4/23/99), 751 So.2d 783, 816 (adopting Buchanan). Buchanan made no change in Louisiana law.
[21] 441 So.2d 707, 716 (La.1983).
[22] Weeks v. Angelone, 528 U.S. 225, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000).
[23] We distinguish the instant case from State v. Martin, 550 So.2d 568, 574 (La.1989), where this court ordered a new sentencing hearing due to the trial court's failure to answer jury's questions which could have led a reasonable juror astray with respect to the necessity of first finding a mitigating factor before recommending life verdict. The jury's request for further instruction from the court essentially asked how they could give effect to the statutory mitigating circumstances they were contemplating during deliberations. The district court in the instant case did not err as previous courts have. For instance: The jurors in the instant case did not ask whether the existence of mitigating factors were necessary for a life verdict. Furthermore, the trial court in this case did not explain to the jury that there need be no "findings" or unanimity with respect to mitigating factors. Wessinger at 40, 736 So.2d at 193. Jurors were not told that there were no presumptions or burdens of proof with respect to mitigating factors. State v. Jones, 474 So.2d 919 (La.1985), cert. denied. 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986). Nor was it made clear that the jury need not find a mitigating factor in order to recommend a life sentence. Martin, 550 So.2d at 574.
[24] State v. Landry, 97-0499 (La.6/29/99), 751 So.2d 214, 215-216; State v. Ford, 338 So.2d 107, 110 (La.1976); State v. Jones, 351 So.2d 1194 (La.1977); State v. Parker, 361 So.2d 226 (La.1978).
[25] State v. Brumfield, 96-2667 (La.10/20/98), 737 So.2d 660, 669.
[26] On June 13 the trial court granted a defense request and issued an instanter subpoena to WWL-TV for an unspecified video tape. On July 6, a minute entry reflects that a pretrial conference "is complete." On July 13, the trial court granted a defense request for subpoenae duces tecum. There was a status hearing on July 14; some subpoenae duces tecum were quashed because previously satisfied and others were issued at defense counsel's request.
[27] A minute entry reflects that the defendant was arraigned May 3. No transcript of that exists but there are (duplicate) transcripts of a short hearing on a joint motion to subpoena the restaurant's business records and another transcript on Antoinette Frank's counsel's subpoena requests in connection with a motion to quash, neither of which is mentioned in the minutes. The minute entry of May 15 reflects that motions were filed by the state and Frank's counsel, which defense counsel Turk adopted, as well as the imposition of a gag order. Only the gag order proceeding is available. There is nothing to suggest that the missing transcript is anything but a de minimus omission from the record. Similarly, the minute of 6/19 reflects that the defense was entitled to some NOPD personnel records, and confirmed the trial dates of defendants. Not mentioned by the minute is proceeding dealing with Frank's attorney's effort to revisit the scene and the court's refusal.
[28] See State v. Ballard, 98-2198, pp. 3-4 (La.10/19/99), 747 So.2d 1077, 1079-1080 (overturning prior rule which had held active duty peace officers incompetent to serve as jurors).
[29] Landry, 751 So.2d at 215-216.
[30] Brumfield, 737 So.2d at 669.
[31] Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State ex rel. Busby v. Butler, 538 So.2d 164, 167-168 (La.1988); State v. Washington, 491 So.2d 1337, 1339 (La.1986).
[32] State v. Ratcliff, 416 So.2d 528, 531 (La. 1982).
[33] Strickland v. Washington, 466 U.S. at 688, 104 S.Ct. 2052; see State v. Brooks, 505 So.2d 714, 724 (La.1987)(an attorney's competence is not judged by the success of a particular strategy hence "no-question defense" was not a deviation below professional norms but a deliberate tactical choice designed to rob the state of the force of its evidence; hindsight is not the test of Sixth Amendment ineffectiveness claims).
[34] State v. Wille, 559 So.2d 1321, 1339 (La. 1990); State v. Prudholm, 446 So.2d 729 (La. 1984); State v. Seiss, 428 So.2d 444 (La. 1983).
[35] State v. Hamilton, 92-2639 (La.7/1/97), 699 So.2d 29, 32-35 (counsel's penalty phase errors, including no opening statement, failure to investigate and present available mental health evidence and a twelve-sentence closing argument, require new penalty hearing); State v. Sanders, 648 So.2d 1272, 1291-1293 (La.1994)(counsel's tepid penalty phase opening admitting unreadiness coupled with failure to present mitigating evidence, prepare witnesses, object to inadmissible unadjudicated other crimes evidence and make a closing argument requires new penalty hearing).
[36] State v. Strickland, 94-0025 (La.11/1/96), 683 So.2d 218, 238-239 (remand for a hearing on whether it was strategy or dereliction for counsel to omit opening and closing statements, fail to investigate and present mitigating evidence, and prepare witnesses); State v. Sullivan, 559 So.2d 1356 (La.1990) (remanding for a hearing to determine if Brady material was suppressed and if counsel was ineffective at the penalty phase of trial); Wille, 559 So.2d at 1339 (claims of incompetent counsel spanning both phases of trial which cannot be resolved on the record require remand and evidentiary hearing).
[37] Objections of one co-defendant is presumed to have been made on behalf of all unless the contrary appears. La.Code Crim Proc. art. 842. By analogy, that applies to written motions as well. State v. Bergeron, 371 So.2d 1309, 1313 (La.1979)(on rehearing).
[38] La.Code Crim. Proc. art. 784, Cmt. (c); State v. Bourque, 622 So.2d 198, 224-225 (La.1993); State v. Copeland, 530 So.2d 526, 535 (La.1988).
[39] Caulfield participated in a chambers conference then conducted the defense voir dire of the first panel through cause challenges and strikes. He did the same with the second and third panels. Caulfield appeared only for voir dire. However, he was not the only attorney assisting Turk.

Walter Critinin (silently) assisted on the second and third days of trial (7/17 and 7/18/95). The transcript of the next day's proceedings begins with this advisement, "As the trial proceeds this date, Mr. Walter Critinin is not present." It is unknown if Critinin returned for the last two days of trial. The minutes mention neither Caulfield nor Critinin.
[40] Caulfield struck a Catholic seminarian who opposed capital punishment but said he could consider it and who had been the subject of a state cause challenge.
[41] It is unclear if the defense had access to the questionnaires. At any rate, the state questioned jurors about capital punishment, ties to law enforcement, their exposure to pretrial publicity about the case, any links to victims of crimes, their understanding of the presumption of innocence and applicable law, including the law of principals, specific intent, and whether they appreciated that the burden of proof was beyond a reasonable doubt and was entirely the state's. Jurors were aware that this was a bifurcated proceeding at which, if the accused were found guilty as charged, the state would ask for the death penalty.
[42] Cf., State v. Landry, 97-0499 (La.6/29/99, 751 So.2d 214)(reversing, in part, over a record so deficient that the court could not review the more than forty cause challenges which had been granted).
[43] Chau Vu could make no identification in the hours after the murders, unlike her brother, Quoc Vu, who picked the defendant's picture from a photo line-up. Both made incourt identifications. John Ross picked out the defendant's picture and, at trial, identified him as the man who bought gasoline with Officer Williams's credit card shortly after the murder.
[44] The misconduct is discussed in Assignments VI, VII and XV and was found to lack merit.
[45] See La.Code Evid. art. 801(D)(1)(c)(prior statements of identification by declarant who testifies and is subject to cross-examination is non-hearsay).
[46] See State v. Myles, 389 So.2d 12, 31 (La. 1980) ("This Court does not sit to second-guess strategic and tactical choices made by trial counsel.").
[47] See State v. Comeaux, 93-2729, p. 21 (La.7/1/97), 699 So.2d 16, 27 (defendant, 17-years-old at commission of the crimes and mildly retarded with an IQ of 68, "made no showing that the degree of his mental impairment, when combined with his youth, rendered him incapable of acting at the level of culpability required for the imposition of the death penalty."), cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998); State v. Mitchell, 94-2078 (La.5/21/96), 674 So.2d 250 (1996)(22 year old mildly retarded defendant with an IQ of between 61 and 71 had full opportunity to present this evidence but that neither federal nor state constitution precluded execution), cert. denied, 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996); State v. Prejean, 379 So.2d 240 (La.1979)(18-year-old, classified as borderline mentally retarded with an IQ of 76 and a mental age of 13½ years; his capital verdict was upheld by this Court), cert. denied, 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980); State v. Brooks, 92-3331 (La.1/17/95) 648 So.2d 366 (unnecessary to consider whether the execution of 20 year old defendant with a tested IQ range of 44 to 67 would be unconstitutional as death sentence reversed on other grounds).
[48] Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)(that includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.").
[49] State ex rel. Busby v. Butler, 538 So.2d 164, 171 (La.1988), citing Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).
[50] LaCaze was arrested 10/10/93 for criminal damage to property valued under $500 and illegal use of a weapon; and, 1/9/95 for aggravated battery. Charges in each were refused.
[51] It is worth noting that meeting the evidentiary requirements of La.Code Crim. Proc. art. 905.4(A)(4) does not include proof of specific intent to kill more than one person; and, this aggravating circumstance "encompasses a broader range of conduct that the first degree murder definition ... in the [parallel] La.Rev. Stat. 14:30(A)(3)." State v. Robertson, 97-0177, pp. 44-45 (La.3/4/98), 712 So.2d 8, 42, quoting State v. Johnson, 541 So.2d 818, 826 (La.1989). Specific intent to kill or inflict great bodily harm upon more than one person, La.Rev.Stat. 14:30(A)(4), is shown by proof that the offender contemplated and actually caused the death of one person and the risk of death or great bodily harm to at least one other person by a series of acts during a single criminal episode or transaction. State v. Roy, 95-0638, p. 19 (La.10/4/96), 681 So.2d 1230, 1242; State v. Williams, 480 So.2d 721, 726-727 (La.1985). A finding of specific intent to kill or inflict great harm on more than one person, La.Rev.Stat. 14:30(A)(3), always supports a finding that the offender knowingly created a risk of bodily harm to more than one person. Art. 905.4(A)(4). See State v. Baldwin, 96-1660, p. 11 (La.12/12/97), 705 So.2d 1076, 1080-1081.