939 So.2d 446 (2006)
STATE of Louisiana
v.
Mark T. CAMBRE.
No. 05-KA-888.
Court of Appeal of Louisiana, Fifth Circuit.
July 25, 2006.
*448 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Thomas J. Butler, Roger Jordan, Jr., Kenneth Bordelon, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Bruce G. Whittaker, Attorney at Law, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., WALTER J. ROTHSCHILD, and FREDERICKA HOMBERG WICKER.
WALTER J. ROTHSCHILD, Judge.
On July 24, 2003, an indictment was filed charging defendant, Mark T. Cambre, with the first degree murder of Kelly Marrione, in violation of LSA-R.S. 14:30.[1] Defendant pled not guilty at his arraignment on the following day.[2] On March 2, 2005, a jury was selected. Following trial, this twelve-person jury returned a verdict of guilty as charged on March 12, 2005. On the following day, at the penalty phase of trial, the jury unanimously voted to sentence defendant to life imprisonment. Defendant was thereafter sentenced on May 6, 2005 to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
Defendant gave oral notice of his intent to appeal his conviction on May 6, 2005. Thereafter, a motion for appeal was filed on May 13, 2005 and was granted on May 17, 2005. This appeal followed.
FACTS
Karen Marrione, the wife of Kelly Marrione, testified that on July 9, 2003, her husband, a New Orleans police officer of twenty-eight years who had retired the previous November, cut the grass at their home and then decided to move furniture in preparation of getting carpet the next day. He then went to Lowe's Home Improvement Warehouse to get a dolly and returned home about 3:45 p.m. At this time, Mrs. Marrione was in a back bedroom and their daughter was outside of the home. Mrs. Marrione heard popping sounds which sounded like fireworks. She believed her husband and a neighbor were playing a joke. She then went down the hall and heard whizzing sounds around her and noticed glass in her kitchen. She also noticed a small white truck pulled all the way in her driveway. She went to the door to see what was going on and when she reached for the doorknob her husband said something like "Get out the way, I've been shot." Her husband went into the den, and because he was a prankster-type person, Mrs. Marrione thought he was playing a joke on her. He then fell to the floor, and she heard the truck quickly leaving her driveway. Mrs. Marrione called 9-1-1 and an ambulance responded. Road blocks were set up to allow the ambulance to get to Charity Hospital unhampered. Despite the efforts at Charity, Mr. Marrione did not survive.
Dr. Susan M. Garcia, an expert in the field of forensic pathology, performed Mr. Marrione's autopsy on July 10, 2003. According *449 to Dr. Garcia, Mr. Marrione sustained gunshot wounds to both his upper and lower arm. The gunshot to the lower arm exited his forearm and reentered his chest, causing a lethal injury to his heart. As a result of this injury, Mr. Marrione bled to death internally.
Connie Fossier, Mr. Marrione's next door neighbor, testified that on the afternoon of July 9, 2003, Mr. Marrione drove up in his vehicle, rolled down his window and chatted with her for about five minutes before she went inside her house. Less than two minutes later, she heard what sounded like fireworks, a rapid succession of seven or eight shots. She then heard three softer, weaker sounding shots and noticed that a window in her house broke. After hearing another set of shots, she went to her side door and saw a white truck with two white males backing out of Mr. Marrione's driveway. She then went to her front window to try to get the vehicle's license plate number; however, the license plate was perfectly covered with what looked like a white cloth.
Kristy Masangya, who lived across the street and two houses over from Mr. Marrione's house, testified that as she was walking towards her sidewalk she heard loud booms coming from down the street. She saw a white truck with two white males and a broken passenger window peeling out of the back of Mr. Marrione's driveway. The license plate was covered with what appeared to be a white tee shirt.
Rene Gelpi and Loren Acosta also testified at trial. On the date of the incident, Rene Gelpi met Loren Acosta at Loren's house around 12:30 or 1:00, they went to eat lunch, and then went to the laudromat and the car wash. Loren received a telephone call from defendant. According to Loren, defendant said he had gotten into a situation with an individual where he was going to rob him but for some reason he did not. When Loren hung up the telephone, he told Rene, "the dumb asses are out trying to rob people." After going to wash his car, Loren received a telephone call from Donald Logan.[3] Based on this call, they picked up Rene's Expedition at Loren's house; Rene drove to defendant's house on Dalton Street. When they arrived, defendant was laying on the sofa bleeding from a gunshot wound. Logan was present and a white truck was backed into the driveway at defendant's house.
Loren and Rene took defendant to Charity Hospital in Rene's Expedition. Rene testified that en route to Charity Hospital, he asked defendant what this was about and that defendant responded, "I ran up to the guy and told him to put his hands up and he came up with a gun and he shot me. And I took off running back to the car, shooting." According to Rene, when asked why he was robbing him, defendant replied that it was for a Rolex. Loren stated that while on the telephone, he overheard defendant saying something to Rene about how he robbed somebody or tried to, and that he got into it with somebody over a watch in Metairie. However, defendant testified that he told Rene and Loren he was shot by a police officer who was supposed to fix some tickets for him and did not tell them he was shot while *450 trying to rob someone of his Rolex. Mr. Marrione had a Rolex watch.
Rene testified that, once they got to the hospital, the story would be that defendant was shot while he was robbed Uptown. Loren testified that defendant said he would give a false name, Marcus Jackson, and a false address of where he was supposedly robbed. About five to ten minutes after arriving at the hospital, Loren was questioned by an officer. At first he lied to the police, but he ultimately told the truth. Rene was questioned as well. He ultimately told the truth and pointed out defendant's house to an officer. A key case was recovered from the Expedition which contained defendant's identification.
Through interviews with Rene and Loren, it was determined Logan was the other person involved. Defendant was arrested at Charity Hospital and Logan was arrested at his residence on July 9th. A search warrant was executed at Logan's residence; on the dresser in his bedroom, a classified section of a newspaper which pertained to a Rolex watch was recovered. After speaking with Logan's brother, it was learned that either Logan's girlfriend or her father owned a white Toyota truck. Thereafter, the truck was located.[4]
Defendant's residence on Dalton Street was searched and no weapons used for the July 9th shooting were found. However, Defendant's brother, Frederick "Sonny" Cambre, provided that he found the guns at that address underneath a child's dresser on the floor after the police had searched the house. These guns, a Beretta .380 caliber semiautomatic and a Browning .380 caliber semiautomatic, were the weapons used on July 9th, with four shots being fired from the Browning and seven from the Beretta.
Lieutenant Dwayne Scheuermann with the New Orleans Police Department collected evidence from Mr. Marrione's person such as his retired police commission, a wallet, a Lowe's store receipt from July 9, 2003 at 3:20 p.m., a watch, a chain and some change.[5] According to Lieutenant Scheuermann, he asked defendant at the hospital what happened to him and was told that his name was Marcus Jackson and he was in the 1700 block of Hillary Street when he was robbed and shot by a black male.[6] Lieutenant Scheuermann went to the location and confirmed that the location was a cemetery. The address where he said he lived was non-existent too.
Warren Smith, a registered nurse at Charity Hospital, testified that he remembered filling out defendant's assessment form on July 10, 2003 while defendant was shackled to the bedside. He testified that defendant told him he was there because "I was shot in a robbery attempt." Defendant denied saying this and instead testified that he was asked why he was in there and responded that "the police say I got shot in an attempted robbery."
Red blood-like substances tested from the Dalton Street address, from the Toyota truck and the Expedition were found to be consistent with defendant. Testing also revealed that droplets of blood found at *451 the crime scene were consistent with defendant's DNA.
Timothy Scanlan, an expert in the fields of firearm and tool marks, blood stain pattern analysis, forensic science and crime scene reconstruction, testified that he participated in the crime scene investigation. The victim's weapon, a .22 caliber mini revolver which held five shots, was recovered from the scene lying in the threshold of the doorway, and five fired cartridge casings from that weapon were also recovered.[7] At the scene, eleven shots were fired but only ten .380 caliber casings were found; however, in the bed of the truck, a fired cartridge casing that matched the casings from the driveway area was recovered. It was determined that three shots actually went through the door itself and two shots passed through the door when it was open, with a total of five shots going into the residence. He testified that he believed Mr. Marrione forcibly closed the door while taking fire. Scanlan testified that by having defendant's blood in the truck and the casing in the truck's bed, the casing links the truck to the scene and the blood in the truck links defendant to the truck.
Scanlan testified that .380 semi-automatics in general will make louder sounds when fired and will shoot much faster than a .22. He testified that the description given by Connie Fossier regarding the shots she heard would suggest that the .380 auto weapons were fired first, then the quieter .22 and then again the louder .380 auto weapons.
Defendant testified to the following: On December 10, 2002, he had a court appearance in front of Judge Quinlin in Criminal District Court where he entered a plea of guilty to possession of marijuana. Frederick, defendant's brother, brought him to court. They got there around 9:00 and left at 11:30. Defendant agreed that he met with Mr. Marrione on this day he guessed between 10:00 and 11:00. However, on redirect, defendant provided that he did not know precisely what time or what date he met with Mr. Marrione at court. Outside of the courtroom on the second floor, Mr. Marrione came up to him, asked if he had a legal problem and introduced himself as Kelly, a retired police officer of twenty-eight or thirty years. Defendant responded that he had a legal problem regarding his driver's license and tickets. After Mr. Marrione said he could probably get it taken care of for him, he took defendant's subpoena and wrote down Kelly, NOPD, a telephone number, DL for driver's license and a dollar sign. Mr. Marrione also gave him a business card which indicated that he was a police officer and wrote his pager number on it.
Defendant testified that he had a job opportunity that required him to have a license. In April, defendant paged Mr. Marrione, and when he called back defendant gave him some information he needed to get defendant's driver's license and tickets taken care of. Two days later, he learned it would cost $3500.00. Defendant's parents agreed to loan him the money in April of 2003, and he met Mr. Marrione at the Tiffin Inn on Veterans to give him the money. Three days later, Mr. Marrione told him it was going to cost an additional $1000.00, so he borrowed that money from his parents as well. That night on April 23rd, Mr. Marrione came to his house for the money and told defendant to reach him the next day; however, defendant provided that Mr. Marrione never responded to his calls.[8]
*452 According to defendant, on July 9, 2003, he went to Lowe's with Logan in Logan's girlfriend's truck. Because there was a ladder in the back of the truck, he agreed to watch it so no one would take it while Logan went into the store to buy a hacksaw. He saw Mr. Marrione coming out of Lowe's across the parking lot putting a hand truck in the back of his vehicle. When Logan returned to the truck, defendant told Logan to try to catch Mr. Marrione as he exited the parking lot. They followed Mr. Marrione from Lowe's and en route, defendant explained to Logan why he wanted to follow Mr. Marrione.
Upon arriving at Mr. Marrione's residence, defendant got out of the passenger side of the truck while Mr. Marrione was coming out of his back door. Defendant said "What's going on, I gave you my money, you're supposed to take care of my license, what's the deal?" Mr. Marrione looked surprised and turned to shut the door. The door was not opened again until after the shooting was finished. Mr. Marrione appeared to be intoxicated and responded, "What the f* * * you're doing at my house, who told you to come here?"[9] Mr. Marrione fired the first shot and looked surprised when the gun went off. This shot went into defendant's kidney and defendant fell to the ground and did not get off the ground until the shooting stopped and Logan helped him up. Although defendant denied knowing at that time Mr. Marrione was hit by a bullet, he admitted that Mr. Marrione was hit with two of defendant's bullets. Defendant had the Browning gun in his pocket and fired four shots back. Mr. Marrione fired at least three shots before he got his gun out to fire one. Logan was shooting behind him.
Defendant testified that he killed Mr. Marrione in self-defense. He provided that this had nothing to do with robbing or attempting to rob him and that nothing was taken from Mr. Marrione. Defendant explained that the ladder in the back of the truck was tied to the bumper and denied that the license plate was intentionally covered.[10]
When defendant got to his house, he learned Logan had called Loren from defendant's phone and told him defendant needed a ride to the hospital. Defendant provided that he went to Charity and while he was there he was on his back surrounded by police who were pushing him down, holding him by his neck, strangling him, slapping him and saying they knew he killed a police officer. They threatened to beat him up and kill him. They were strangling and slapping him. Defendant believed if he told them he shot Mr. Marrione he may have been killed and, therefore, he used the name Marcus Jackson and said he was shot and robbed on Hillary Street.
Defendant's mother, Sandra Cambre, and his father, Gilbert Cambre, testified that they were aware their son's driver's license was suspended and that he was attempting to get his driver's license back with the help of a retired policeman. They testified that their son asked for money in April of 2003 and that they loaned their son $3500.00 and then another $1000.00 two or three days later to get his driver's license back. Defendant's mother specifically *453 recalled that the first loan of $3500.00 was given to him on April 21, 2003. According to defendant's parents, defendant had job opportunities for which he needed his driver's license.
In May of 2003, defendant's mother bought defendant's house and with the money he received from the equity, defendant repaid his parents. According to defendant's mother, defendant repaid her this money and other money he owed her, totaling $7000.00, and that the $12,291.48 balance was deposited into defendant's account on May 14, 2003. The balance of this account on July 1, 2003 was $480.88, and then on July 7, 2003 it was $48.63. Defendant's mother provided that large sums of money were withdrawn to fix his car.
Defendant's father testified that during the investigation of this case, he wore defendant's jacket that was at his house. A paper with the name "Kelly" and a phone number fell out of the pocket when he got to work. Defendant testified that the handwriting on the back of this document was his. Defendant provided that the 822-5711 number was the first number Mr. Marrione gave him. Lieutenant Grey Thurman of the Jefferson Parish Sheriff's Office testified that, before defendant's father located the document with this phone number in the jacket, defense counsel faxed Mr. Marrione's cell phone records to him and this number appeared once in those records.[11] This telephone call lasted one minute, and the number was for Armondo Leyva and his wife Esperanza Leyva who only speaks Spanish.[12] Esperanza Leyva testified through an interpreter and denied knowing Mr. Marrione.
Defendant's brother, Frederick Cambre, testified that he brought defendant to Orleans Parish Criminal District Court in December of 2002. He testified that he went outside and smoked a cigarette and made it back before his brother went into court. He provided that when he was walking up the stairs he saw his brother shaking hands with Mr. Marrione, but did not hear their conversation. He provided that on December 10th, he picked up his brother and they got to court around 8:30. He believed defendant pled guilty and they left around 11:30.
Another brother of defendant, Tyrus Cambre, testified that he was introduced to Mr. Marrione as "Officer Kelly" while he was at defendant's house on Dalton Street in late April to get $1000.00. According to Tyrus, Mr. Marrione and his brother talked in private and he stayed under five minutes. Tyrus provided that afterwards defendant told him that this officer was going to fix some tickets for him and help him get his license back.
Defendant's sister, Leslie Cambre Hoffman, testified as well. She provided that she was aware that defendant had borrowed some money to pay either a police officer or a retired police officer to get his driver's license back.
Tina Schiaffino,[13] Operations Manager of Dillard's Department Store, testified *454 that she pulled Mr. Marrione's credit card receipt from Dillard's Department Store at the Esplanade Mall in Kenner for December 10, 2002 at 11:03 a.m. This was the date and time that defendant testified he first met Officer Marrione in the Gretna courthouse. The Dillard's record indicates that on this date, a credit card purchase was made for male clothing, and the receipt was signed by Mr. Marrione. Mrs. Marrione identified her husband's signature.
At the conclusion of trial, the jury found defendant guilty as charged.
ASSIGNMENT OF ERROR NUMBER ONE
It was error to conduct voir dire outside the presence of defendant. In that portion of the voir dire the court denied a challenge for cause in error.
DISCUSSION
Defendant argues that the defense was forced to use a peremptory challenge to back strike juror Donna Braud[14] after the trial court denied defense's challenge for cause. Defendant contends that this portion of voir dire was not recorded and at a re-creation hearing pertaining to this matter defense counsel provided that this juror was acceptable by the defense instead of noting the challenge. Defendant argues that defendant's presence was required for voir dire and that, had defendant been present for the re-creation hearing, he would have had the opportunity to correct this.
The State responds that defendant's presence was not required at the hearing. The State further argues that it was defense counsel who suggested that the jury selection record be re-created and that prejudice has not been demonstrated. The State contends that even if defendant's presence was required, not only was defendant's presence waived, but defense counsel failed to object to defendant's absence and, therefore, review of this matter has been waived.
On March 2, 2005, a jury was selected in this case. However, when jury selection was completed, it was discovered that the court reporter had run out of paper and the recording machine was not on for group number one; therefore there was no record for this portion of the jury selection except for what was contained in the notes and in the minute entry.[15] On the following day, defense counsel suggested that what they needed to do with the record was to go back and try to re-create it. He provided that he could not ultimately waive anything but thought they could reasonably re-create what was done with the court reporter. The court agreed. Defense counsel provided that his client was not there, but he waived his presence. The court provided that they would try to re-create on the record what was done with group number one. When re-creating what occurred with Donna Braud, it was provided that she was acceptable by the State and defendant. Thereafter, the court asked if anyone had any disagreement and defense counsel responded: "As counsel on behalf of the defense, I believe that accurately reflects what had transpired at that time." The State agreed.
For the prosecution of a felony, Louisiana Code of Criminal Procedure article 831 dictates when a defendant shall be present, providing, in pertinent part,

*455 A. Except as may be provided by local rules of court in accordance with Articles 522 and 551, a defendant charged with a felony shall be present:
(1) At arraignment;
(2) When a plea of guilty, not guilty, or not guilty and not guilty by reason of insanity is made;
(3) At the calling, examination, challenging, impanelling, [sic] and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror;
(4) At all times during the trial when the court is determining and ruling on the admissibility of evidence;
(5) In trials by jury, at all proceedings when the jury is present, and in trials without a jury, at all times when evidence is being adduced; and
(6) At the rendition of the verdict or judgment, unless he voluntarily absents himself.
However, the Louisiana Supreme Court has recognized that the provisions of LSA-C.Cr.P. art. 831 are not absolute. State v. Broaden, 99-2124 (La.2/21/01), 780 So.2d 349, 360, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001). A defendant may waive his presence by voluntary absence pursuant to LSA-C.Cr.P. art. 832 or by not objecting to his absence from an article 831 A(3) hearing, as is required under the general contemporaneous objection rule to preserve the matter. Id. (citing LSA-C.Cr.P. art. 841; State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, 367-369, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996)).[16] However, as noted in the comments to LSA-C.Cr.P. art. 832, this voluntary absence waiver provided for by article 832 is limited to noncapital cases.
As provided by the Louisiana Supreme Court in the capital case of State v. Brown, 03-0897 (La.4/12/05), 907 So.2d 1, 14, "[a]lthough this Court has ruled that a defendant may `waive' his right to be present in a non-capital case, it has never ruled that a defendant in a capital case may absent himself during the key phases of the trial specified in La. C. Cr. P. art 831." (citation omitted). However, the court in that case found that a criminal defendant is not entitled to be present at a pre-trial status hearing.
In the present case, we fail to find that defendant's presence was required at the hearing to re-create the record. LSA-C.Cr.P. art. 831 does not provide that a defendant is required to be present at such an event, and we find this hearing was not a key phase of trial. Although LSA-C.Cr.P. art. 831 A(3) provides that a defendant charged with a felony shall be present at the calling, examination, challenging, impaneling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror, the minute entry in this case reflects that defendant was present for the actual jury selection which was not transcribed on March 2, 2005.
Moreover, defense counsel explicitly waived defendant's presence during the re-creation and therefore failed to preserve this issue for review. See, State v. Brown, supra at 14 (citations omitted). The record reflects that it was defense counsel's suggestion to re-create the record for the missing portion of the jury selection. At no time did defense counsel object to the re-creation, and instead acknowledged that it was an accurate reflection *456 of what had taken place the day before.
In State v. Sherman, 630 So.2d 321, 322 (La.App. 5 Cir.1993), writ denied, 94-0258 (La.5/6/94), 637 So.2d 1046, the defendant was convicted of second degree murder. On appeal, the defendant argued that the trial court erred in permitting the examination and discharge of potential jurors outside of his presence. Id. at 325. During jury selection, numerous potential jurors were examined, challenged and excused during bench conferences or in chambers outside of defendant's presence. Id. However, defense counsel failed to make a contemporaneous objection to the defendant remaining seated at counsel table while parts of the jury selection were conducted in the defendant's absence. Id. As such, this Court concluded that because defense counsel failed to make a contemporaneous objection as required by LSA-C.Cr.P. art. 841(A), the defendant was precluded from raising the issue on appeal. Id.
It is noted that the potential juror in question, Donna Braud, did not serve on the jury. Further, the March 2, 2005 minute entry does provide that defense challenged her for cause, it was denied by the court, defense's objection was noted, she was accepted and then backstricken by the defense.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER TWO
Deficiencies in the appeal record due to the failure to record voir dire have deprived appellant of his right to meaningful review, requiring a reversal and remand for a new trial.
DISCUSSION
Defendant argues that, because of the failure to record the voir dire of Juror Braud, it is impossible to review the trial court's denial of the Braud challenge for cause, putting defendant's conviction and life sentence beyond the reach of appellate review and denying his constitutional and statutory due process rights. Defendant argues that all of his peremptory challenges were used and, therefore, the trial court's error in failing to record voir dire was not harmless and the presumption of prejudice mandates reversal.
The State responds that defendant did not object to re-creating the record as to the jury selection or request a mistrial and that it was defense counsel who suggested the re-creation. Further, the State contends that only the challenges made on March 2, 2005 were unable to be transcribed and it appears the remainder of the jury selection was not transcribed due to the failure of defense counsel to request the transcription. The State concludes that the re-creation should be sufficient for a meaningful review on appeal and that defendant failed to show prejudice.
The Louisiana Supreme Court and the United States Supreme Court have made clear that a criminal defendant has a right to a complete transcript of the trial proceedings, in particular, where as here, appellate counsel was not counsel at trial. State v. Deruise, 98-0541 (La.4/3/01), 802 So.2d 1224, 1234, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001) (citations omitted). The interests of justice require that a defendant be afforded a new, fully recorded trial where a defendant's attorney is unable, through no fault of his own, to review a substantial portion of the trial record for errors so that he may properly perform his appellate counsel duties. State v. Ford, 338 So.2d 107, 110 (La.1976).
In addition, the Louisiana Constitution guarantees a defendant the right of appeal *457 "based upon a complete record of all the evidence upon which the judgment is based." State v. Deruise, 802 So.2d at 1234 (citing La. Const. art. I, § 19). As a corollary, LSA-R.S. 13:961(C) provides that, in criminal cases tried in the district courts, the court reporter shall record all portions of the proceedings required by law and shall transcribe those portions of the proceedings required. LSA-C.Cr.P. art. 843 provides, in pertinent part, that in felony cases, the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders and charges by the court, and objections, questions, statements and arguments of counsel.
Although the Louisiana Supreme Court has found reversible error when material portions of the trial record were unavailable or incomplete, a "slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal" does not require reversal of a defendant's conviction. State v. Boatner, 03-0485 (La. 12/3/03), 861 So.2d 149, 153 (citations omitted). A defendant is not entitled to relief because of an incomplete record unless there is a showing of prejudice based on the missing portions of the transcript. Id. (citations omitted).
In State v. Jenkins, 02-161 (La.App. 5 Cir. 9/30/03), 857 So.2d 1185, writ denied, 04-2533 (La. 11/28/05), 916 So.2d 130, the defendant asserted that it was impossible to review the court's ruling of his motion to suppress because a portion of the transcript from the suppression hearing was missing. In Jenkins, the court reporter filed a letter into the record stating the last tape of the suppression hearing was lost and could not be transcribed. The trial court held a hearing to address the missing transcript in which one of the witnesses was available to testify. A portion of the cross-examination of this witness was missing. However, the defense counsel provided she had no questions for this witness that had not already been addressed on the record and did not object to the trial court's ruling regarding the missing transcript. As such, this Court concluded the defendant waived any objection to this portion of the missing transcript.
In State v. Plaisance, 00-1858 (La.App. 4 Cir. 3/6/02), 811 So.2d 1172, 1187-1188, writ denied, 02-1395 (La.11/27/02), 831 So.2d 270, cert. denied, 538 U.S. 1038, 123 S.Ct. 2084, 155 L.Ed.2d 1071 (2003), the defendant argued that the record did not contain transcriptions of the general voir dire bench conferences during which both the State and the defense made peremptory strikes and challenges for cause. He argued that he was prejudiced by the absence of the bench conference transcripts because his claim regarding the trial court's error in denying him the right to back-strike jurors, asserted in another assignment of error, could not be reviewed. In Plaisance, although the record did not contain transcripts of the general voir dire bench conferences, a minute entry from the trial reflected that the trial court excused twenty-seven jurors for cause, that the defendant exercised seven peremptory challenges, and that the State exercised nine.
The Plaisance court provided that "the fact that the record does not contain transcripts of the general voir dire bench conferences does not automatically warrant reversal. The defendant must demonstrate that he suffered specific prejudice as a result of those conferences not being transcribed."
We find that the missing portion of the trial record concerning jury selection is not evidentiary and, therefore, its absence *458 does not compromise defendant's constitutional right to a judicial review of all evidence. See, State v. Thomas, 92-1428 (La. App. 4 Cir. 5/26/94), 637 So.2d 1272, 1274, writ denied, 94-1725 (La.11/18/94), 646 So.2d 376, cert. denied, 514 U.S. 1054, 115 S.Ct. 1437, 131 L.Ed.2d 317 (1995).
Defendant argues that because of the failure to record the voir dire of Juror Braud it is impossible to review the trial court's denial of the Braud challenge for cause putting defendant's conviction and life sentence beyond the reach of appellate review. However, as in Jenkins, defense was given an opportunity to re-create the missing portion of the record and no objection was made regarding the missing transcript. Following Jenkins, this Court concludes that defendant waived any objection to this portion of the missing transcript.
Further, we find that defendant is not entitled to relief because of the incomplete record, absent a showing of prejudice based on the missing portions of the transcripts. As noted previously, Juror Braud did not serve on the jury and, assuming the minute entry is correct, was backstricken.[17]
We also note that the minute entry could be incorrect. Defense counsel and the State agreed the re-creation hearing was an accurate reflection of what took place the previous day during jury selection. A transcript of the actual jury selection at that time was not recorded and cannot be transcribed. As such, the transcript established from the re-creation hearing stands as the substitute. When there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983). We find that according to the transcript, that is, the re-creation hearing agreed to by counsel, there was no challenge for this Court to review.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER THREE
It was error to conduct a hearing addressed to a juror's fear of appellant outside of the presence of appellant.
DISCUSSION
Defendant argues that the trial court erred in addressing a juror's fears and concerns regarding defendant outside of his presence, despite defense counsel's waiver of his presence.
The State responds that the juror's discomfort with her perceived lack of security in the courtroom was addressed in a bench conference after defense counsel waived defendant's presence. The State further argues that this issue is waived since there was no objection as to his absence. The State also argues that when the parties agreed to let the bailiff inform the jurors that the court was satisfied with the security in the courtroom, the record reflects defendant was present. Finally, the State contends defendant's presence was not required for the bench conference.
During trial after a luncheon recess was taken, defense counsel waived defendant's presence and then during a bench conference the judge informed counsel of questions from the jury. The court informed them that one of the jurors was very uncomfortable with defendant being by them. However, the court later clarified that her problem was not that he was there, but that he was standing in front of them with *459 no security around. Defense counsel agreed with the State's idea and provided that when the jury came in they could be told they were moving back one row to be in a better position to see all the various demonstrations at one time. The bailiff clarified that the juror was by herself when she talked to him and the trial judge did not believe she conveyed her thoughts to the rest of the jury.
Thereafter, the record reflects that defendant entered the courtroom just prior to another bench conference in which the court asked if there was a problem with the bailiff addressing the juror by herself to tell her the court was comfortable with the courtroom's security. Defense counsel provided that he would prefer the instruction come from the court. The court provided that it was planning on bringing the jury in, moving them and at some point, when the bailiff could get the juror alone, to tell her the court was comfortable with security in the courtroom. Defense counsel responded, "If that's all he said, then we're good."
We find that defendant's presence was not required for this bench conference concerning a juror's discomfort with courtroom security. LSA-C.Cr.P. art. 831 provides that a defendant shall be present at the calling, examination, challenging, impaneling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror. At the time of this bench conference, the jury was already sworn in and at no time did the bench conference address the discharge of this juror. Further, defendant's presence was waived at the time of the first bench conference on this matter. The second bench conference took place after the defendant entered the courtroom.
"There is no jurisprudence, or specific statutory provision that requires the defendant's presence at a bench conference in order to satisfy Article 831." State v. Williams, 34,359 (La.App. 2 Cir. 5/9/01), 786 So.2d 203, 212, writ denied, 01-2275 (La.5/10/02), 815 So.2d 835 (citing State v. Wesley, 33,402 (La.App. 2 Cir. 5/10/00), 759 So.2d 286, writ denied, 00-1702 (La.4/12/01), 788 So.2d 1201; State v. Glover, 93-959 (La.App. 5 Cir. 3/29/94), 636 So.2d 976, writ denied, 94-1460 (La.9/3/96), 678 So.2d 544, writ granted in part and remanded, 97-1474 (La.12/19/97), 704 So.2d 242).
We further find that even if defendant's presence was required, defense counsel's participation in these discussions after waiving defendant's presence and defendant's presence in the courtroom for the conclusion of the discussions are sufficient to provide the constitutional protection mandated by LSA-C.Cr.P. art. 831. In addition, defendant failed to object regarding defendant's absence. As such, we find this issue has not been preserved for review.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER FOUR
Trial counsel provided ineffective assistance of counsel in failing to move for a mistrial based upon the State's improper reference to appellant's post-arrest silence.
DISCUSSION
Defendant argues that defense counsel provided ineffective assistance of counsel at trial in failing to move for a mistrial which was warranted after the State made an improper reference to defendant's post-arrest silence during cross-examination of him.
The State responds that prior to defendant's answering the question, defense counsel immediately objected to the line of questioning, the State withdrew the question *460 and defendant did not answer the question.[18] As such, the State contends defendant was not prejudiced and defendant was not entitled to a mistrial. The State further argues that the record reflects defense counsel did not want a mistrial, making the decision not to move for a mistrial a tactical one within the ambit of trial strategy.
On cross-examination of defendant, the State asked the following final question: "Now at this point, July the 10th, when the police searched your residence, you had never given any statements to the police about what had happened to you; correct, with Kelly Marrione?" Before defendant answered the question, defense counsel objected and a bench conference was held. Defense counsel stated that "[a]sking my client if he made any statements to the police at this point, is absolutely reversible error. And I'm not going to bite into moving for a mistrial at this point . . ." The State withdrew the question.
A defendant is entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution. State v. McDonald, 04-550 (La. App. 5 Cir. 11/16/04), 889 So.2d 1039, 1042, writ denied, 04-3088 (La.4/1/05), 897 So.2d 599. To establish an ineffective assistance of counsel claim, a defendant must demonstrate (1) that his attorney's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that his counsel's errors or omissions resulted in prejudice so great as to undermine confidence in the outcome. Id. (citing Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. LaCaze, 99-0584 (La.1/25/02), 824 So.2d 1063, 1078, cert. denied, 537 U.S. 865, 123 S.Ct. 263, 154 L.Ed.2d 110 (2002)). To demonstrate prejudice, the defendant must demonstrate that, but for his counsel's unprofessional conduct, the outcome of the trial would have been different. Id. (citing Strickland v. Washington, supra at 693, 104 S.Ct. 2052). An error is prejudicial if it was so serious as to deprive the defendant of a fair trial or a trial with a reliable result. State v. Washington, 03-1135 (La.App. 5 Cir. 1/27/04), 866 So.2d 973, 983.
The Sixth Amendment does not guarantee a defendant errorless counsel or counsel judged ineffective by hindsight. State v. LaCaze, supra at 1078. Ineffective assistance claims are assessed on the facts of the particular case as seen from the counsel's perspective at the time. Id. at 1078-1079. As such, there is a strong presumption that counsel's conduct will fall within the wide range of reasonable professional assistance. State v. LaCaze, supra at 1079 (citations omitted).
Rather than on direct appeal, an ineffective assistance of counsel claim is most appropriately addressed through an application for post-conviction relief filed in the trial court where a full evidentiary hearing can be conducted. State v. McDonald, 889 So.2d at 1042 (citation omitted). Although such a claim may be addressed on appeal when the record contains sufficient evidence to rule on the merits of the claim and the issue is properly raised on appeal by assignment of error, we decline to address these claims herein. In defendant's pro se brief, he raises additional claims of ineffective assistance of counsel, and we find there is insufficient evidence in the record to review these claims on appeal. Under these circumstances, where there is sufficient evidence to consider some but not all of *461 the allegations, we find that all claims of ineffective assistance will be more properly addressed on post-conviction relief at an evidentiary hearing. See, State v. Taylor, 04-346 (La.App. 5 Cir. 10/26/04), 887 So.2d 589, 595; State v. Williams, 05-673 (La. App. 5 Cir. 3/14/06), 926 So.2d 665, 675.
PRO-SE ASSIGNMENT OF ERROR NUMBER ONE
Counsel further committed reversible error, when he failed to call alibi defense witness (Donald Logan).
DISCUSSION
Defendant argues that defense counsel was ineffective for failing to call a defense alibi and impeachment witness, Donald Logan, who was the only person capable of establishing the victim was shot in self-defense and that there was no intent or attempt to rob the victim.
This Court has provided that "[t]he election to call or not to call a particular witness is a matter of trial strategy and is not per se evidence of ineffective assistance." State v. Washington, 00-1312 (La.App. 5 Cir. 5/16/01), 788 So.2d 596, 607, writ denied, 01-1718 (La.5/3/02), 815 So.2d 94 (citation omitted). In Washington, after the defendant argued he had received ineffective assistance of counsel because his trial counsel failed to call a witness at trial, this Court provided the following:
Ineffectiveness of counsel, relating to trial strategy, cannot be determined by review of the record on appeal. Such a claim must be asserted by application for post-conviction relief where the issue can be fleshed out through an evidentiary hearing, if necessary, to determine, among other things, the defense strategy and whether the Defendant was himself aware of the strategy and acquiesced in it. This assignment of error lacks merit.
Id. at 607.
We find that the failure to call Logan was a matter of trial strategy and that ineffectiveness cannot be determined by review of the record on appeal. This claim may be asserted by application for post-conviction relief.
PRO-SE ASSIGNMENT OF ERROR NUMBER TWO
The trial court committed reversible error, when it failed to inquire into issue of juror bias, when the juror may have become incompetent to further serve in accordance with La.C.Cr.P. Art. 796.
DISCUSSION
Defendant argues the trial judge committed reversible error when the judge failed to inquire into the issue of jury bias in which a juror may have become incompetent to serve in accordance with LSA-C.Cr.P. art. 796, and because the court made no motions to inquire into this juror's fears or concerns of bias as to defendant, his rights under the Sixth and Fourteenth Amendments to the United States Constitution were violated. Briefly, defendant states that counsel was ineffective by not making any motions to inquire into this juror's fears or concerns of bias as to defendant. We find that this assignment also represents another ineffective assistance of counsel claim.
After the court informed counsel that a juror was uncomfortable with defendant standing in front of them with no security around, the court provided that it was planning on bringing the jury in, moving them and at some point when the bailiff could get the juror alone he would tell her the court was comfortable with the courtroom security. Defense counsel did *462 not object to the manner in which this would be handled.
We find that whether the trial court committed error regarding the juror in question has not been preserved for review, since defense counsel failed to object and instead acquiesced in the remedy proposed. See, LSA-C.Cr.P. art. 841. As such, this portion of this pro se assignment of error is without merit.
As to the ineffective assistance of counsel claim, we find that this issue cannot be addressed on direct appeal. Instead, the issue may be asserted in post-conviction relief proceedings where an evidentiary hearing could be conducted to determine whether defense counsel was ineffective for failing to inquire into the potential juror bias. Because there is insufficient evidence in the record to consider all of the allegations of ineffective assistance of counsel, we pretermit further discussion of these claims in this appeal. See, State v. Williams, 05-673 (La.App. 5 Cir. 3/14/06), 926 So.2d 665, 675; State v. Taylor, 04-346 (La.App. 5 Cir. 10/26/04), 887 So.2d 589, 595.
ERROR PATENT DISCUSSION
In the final assignment of error, defendant requests an error patent review. However, this Court routinely reviews the record for errors patent in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990) regardless of whether defendant makes such a request. Our review of the record in this case reveals no errors which require corrective action by this court.
DECREE
Accordingly, for the reasons assigned herein, the conviction and sentence of defendant, Mark T. Cambre, are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] It is noted that codefendant Donald A. Logan, Jr. was also indicted for the first degree murder of Kelly Marrione.
[2] Defendant's first trial in this matter ended in a mistrial on August 18, 2004, following the death of defendant's brother, James. After speaking to two doctors, the trial court had grave concerns for the health of defense witnesses that were family members of defendant.
[3] Loren had a car wash receipt from July 9, 2003 at 3:56 p.m. Dispatch time for the homicide was at 3:45 p.m. Telephone records of Loren and the Cambre number were compared. These records showed that on July 9th at 3:10 p.m. the Cambre number called Loren, and at 3:58 p.m. another call was made to Loren. Loren's records showed incoming calls on July 9th at 3:10 p.m. and at 3:58 p.m. Defendant admitted that he talked to Loren at 3:10 p.m., but stated that they discussed getting Loren's car towed and that Loren was called again by Logan at 3:58 p.m.
[4] The truck had a broken passenger side window, and glass particles were recovered from the scene.
[5] About three pennies were found on Mr. Marrione. According to Mrs. Marrione, her husband always carried a money clip with him. No money clip was found on him, and Mrs. Marrione did not know what happened to it.
[6] Delores M. Thornton, a Charity Hospital patient liaison, testified that she was also supplied the name Marcus Jackson from the patient and his friend, Loren Acosta.
[7] Mr. Marrione was authorized to carry a concealed weapon.
[8] Cell phone records of Mr. Marrione did not contain defendant's phone number.
[9] At the time of the autopsy, Mr. Marrione had .13 percent alcohol in his blood. Connie Fossier, Mr. Marrione's neighbor, testified that he did not seem intoxicated to her when she talked to him.
[10] Kristy Masangya did indicate to the police that there may have been a ladder in the back of the truck. However, Rene denied seeing a ladder in the white truck at defendant's house.
[11] Defendant's father, an employee of Bell South Technology, assisted defense counsel with telephone records and numbers, including accessing certain numbers and names. Although he did not recall viewing Mr. Marrione's cell phone records, he admitted that he was given some numbers by the defense from Mr. Marrione's records during the first trial.
[12] Lieutenant Thurman testified that 821-5711 was Malcolm Faber's Trophy Shop and it was determined that Mr. Faber knew Mr. Marrione. (Emphasis added).
[13] It is noted that her last name is also spelled "Sciaffino" in the record.
[14] It is noted that this juror's last name is also spelled "Breaux" in the record.
[15] We note that pursuant to proper procedure, the court report should manually take down all proceedings, including voir dire, and operate the recording machine as a back-up device.
[16] LSA-C.Cr.P. art. 841(A) provides, in pertinent part, that an irregularity or error cannot be availed of after the verdict unless it was objected to at the time of the occurrence.
[17] We also note that if this juror was so important to remove that a peremptory challenge would have been used at that time without a delay as evidenced from the backstrike, that the defense counsel would have remembered the problematic juror the following day at the re-creation hearing.
[18] It should be mentioned here that an experienced prosecutor should not pose a question to defendant that is meant to elicit an illegal or unconstitutional response.